IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 6, 2004 Session

## STATE OF TENNESSEE v. MATTHEW KIRK MCWHORTER

**Direct Appeal from the Criminal Court for Montgomery County**
**No. 49900104     John H. Gasaway, Judge**

---

**No. M2003-01132-CCA-R3-CD - Filed August 30, 2004**

---

A Montgomery County jury convicted the Defendant, Matthew Kirk McWhorter, of three counts of aggravated sexual battery, and the trial court imposed an eight-year sentence for each conviction, to be served consecutively.  On appeal, the Defendant contends that: (1) insufficient evidence exists in the record to support his convictions; (2) the trial court erred by not requiring the State to elect the offenses it wished to submit to the jury; (3) the trial court improperly admitted a law enforcement officer's testimony about the Defendant's uncharged conduct; (4) the trial court erred by permitting a law enforcement agent to testify about a recorded recollection; (5) the trial court erred by denying the Defendant's motion to prohibit testimony of the victim; (6) reversible error occurred when the State failed to disclose, preserve and turn over a law enforcement official's notes made during the Defendant's initial interrogation; (7) the trial court erred by allowing the State to submit an insufficient Bill of Particulars and to deviate from its Bill of Particulars; (8) the trial court erred in denying the Defendant's motion to suppress his written and oral statements made to law enforcement officials in Florida; (9) the trial court erred by failing to instruct the jury on child abuse as a lesser-included offense; (10) the State's closing arguments were so improper that they infected the trial with unfairness and denied the Defendant due process; (11) the trial court erred by interrupting the natural flow of jury deliberations to give supplemental instructions; and (12) the trial court erred in ordering the Defendant to serve his sentences consecutively.  After thoroughly reviewing the record, we conclude that the trial court erred by failing to require the State to elect which incident of sexual touching the State intended for the jury to consider for Count 1, aggravated sexual battery. Accordingly, we reverse the conviction and the sentence in Count 1.  We affirm the remaining convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part;
and Reversed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Mandy Waldrop Denson, Clarksville, Tennessee for the appellant, Matthew Kirk McWhorter.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; Arthur Beiber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's sexual molestation and rape of A.G.[1] in Clarksville in 1997 and 1998. On December 8, 1998, the Montgomery County Grand Jury indicted the Defendant on sixty-five counts of rape of a child and four counts of aggravated sexual battery involving five different victims. On September 26, 2000, the Defendant pled guilty to four counts of aggravated sexual battery, but the trial court allowed the Defendant to withdraw those guilty pleas. On July 3, 2002, the trial court granted the Defendant's motion to sever the sixty-nine counts according to the five victims alleged in the indictments. The State gave notice that it would first try the following counts: Count 3, aggravated sexual battery of A.G.; Count 4, child rape of A.G.; and Count 5, child rape of A.G. The trial court denied the Defendant's motion in limine to exclude his handwritten and post-arrest statements. The trial court also denied the Defendant's motion to prohibit A.G. from testifying because of the lost file containing recorded prior statements of A.G. and instead instructed the jury regarding the lost file. A jury convicted the Defendant of three counts of aggravated sexual battery on July 25, 2002. The trial court sentenced the Defendant to eight years for each offense, and ordered that the sentences run consecutively, for an effective sentence of twenty-four years. The Defendant now appeals.

### A. Trial

The following evidence was presented at the Defendant's trial. A.G. testified that he was eleven years old at the time of the trial. A.G. said that he had an older brother who was fifteen and a younger sister who was eight. He stated that his father was in the United States Army and was stationed at Fort Campbell near Clarksville in 1997. He explained that other children also lived in his Clarksville neighborhood between 1997 and 1998. He testified that he knew the Defendant because the Defendant lived across the street from his family's house. A.G. stated that he was friends with a young boy who lived with the Defendant. He said that he played kickball and baseball with other children when he lived near the Defendant. He stated that he also enjoyed playing Nintendo video games, especially Super Smash Brothers, at his house with his brother and his friends.

A.G. testified that the Defendant came to his house on several occasions to visit him or baby-sit him, though he could not remember how many times the Defendant came over. He stated that, when the Defendant baby-sat him, his brother and sister would also be in the house. A.G. testified that, on one such occasion, the Defendant reached under A.G.'s pajamas and touched his "private part" with his hand when the two were in A.G.'s bedroom, which he shared with his brother. He

---

[1]It is the policy of this Court to use the initials of child sexual abuse victims instead of their names.

stated that his parents were at home when the Defendant first touched his penis. A.G. said that the Defendant touched his penis on another occasion when his parents were at "Ms. Sherry's house" across the street. He testified that, while his parents were across the street at "Ms. Sherry's house" and his brother was on the floor of the bedroom playing video games, the Defendant, who was on the bed with A.G., reached under A.G.'s pajamas and touched his penis. A.G. testified that, on a different occasion in his sister's room, the Defendant put his mouth on A.G.'s "front private part." He stated that, on another occasion in his sister's room, the Defendant made A.G. put his mouth on the Defendant's penis and touch the Defendant's penis with his hand. A.G. testified that he could not remember how many times the Defendant touched his penis or he touched the Defendant's penis.

A.G. stated that he never told his mother or his father about the sexual abuse because the Defendant "would give me stuff . . . . [i]f I wouldn't tell." He testified that the Defendant told him that he would give him a Nintendo 64 if he agreed not to tell his parents about the sexual abuse. A.G. stated that he could not remember who he first told about the abuse.

On cross-examination, A.G. testified that he could not remember exactly how old he was when the Defendant touched him, but he remembered that he was in the second or third grade. A.G. stated that he enjoyed playing Nintendo combat games like Mortal Combat with his older brother. He said that he could not remember when the Defendant told him that he would give him a Nintendo 64 if he did not tell his parents about the abuse. A.G. testified that he told his parents about the sexual abuse "when they found out," though he could not remember how they found out about the abuse. He said that, when he told his parents, "[t]hey said they loved me." He stated that he could not recall going to the Department of Children's Services. A.G. said that he remembered testifying in front of a grand jury, though he could not recall what he said. He stated that he remembered telling the grand jury the same thing that he was testifying to at this trial. A.G. said that he remembered telling the Grand Jury that the Defendant put his mouth on his penis and that A.G. put his mouth on the Defendant's penis. He testified that, when his parents went to "Ms. Sherry's house," he and the Defendant went into his sister's room, and the Defendant put his mouth on his penis. A.G. stated that he could not remember what the Defendant was wearing at that time, though he recalled that it was nighttime when the Defendant sexually abused him. He explained that the Defendant was good friends with his parents and himself, and he was not afraid of the Defendant.

A.G. said that the first incidence of sexual abuse occurred during the school year, and then a summer passed between that incident and the next, which also occurred during the school year. He stated that, every time the Defendant sexually abused him, the door to the room would be closed. A.G. said that he talked with some of the prosecutors about the sexual abuse before testifying in front of the grand jury and at trial. He stated that he also talked with a counselor at Fort Campbell about the sexual abuse.

R.G.,[2] A.G.'s mother, testified that her husband was assigned to duty at Fort Campbell from

---

[2]In order to protect the privacy of the child victim's family, we will use the victim's mother's initials instead of her name.

1996 to 2000. She stated that, during that four year period, she and her family lived on May Apple Drive in Clarksville. R.G. said that she was good friends with her neighbor, Sherry Dowker. She testified that she knew the Defendant because he moved in with the Farr family across the street. She explained that the Defendant worked on her family's computer after it crashed in 1996, and he would talk with her children. R.G. stated that A.G. and his brother would play outside and play Super Nintendo inside. She said that, until she learned of the sexual abuse, she considered the Defendant a friend. She explained that she would occasionally ask the Defendant to baby-sit the children while she and her husband went to military functions or across the street to Sherry Dowker's house. She said that the Defendant baby-sat for her about five to seven times in 1997 and 1998. R.G. testified that the Tennessee Department of Children's Services ("DCS") called her in late July or early August of 1998 regarding the sexual abuse of A.G. She said that Deanna Groves of DCS interviewed A.G., and he received a physical exam at the Our Kids Center in Nashville about two weeks after DCS called her. She testified that she told A.G. to tell the truth.

On cross-examination, R.G. said that DCS told her to bring A.G. down to DCS in Nashville. She testified that Deanna Groves told her and her husband that the Defendant said that he sexually abused A.G. She stated that A.G. told her about the sexual abuse about a week after they met with DCS. R.G. testified that A.G. made very specific disclosures about how he was sexually abused by the Defendant. She acknowledged that the Our Kids Center report stated that "[R.G.] . . . reports that [A.G.] has not made a specific disclosure about the nature of sexual contact." She also acknowledged that the Our Kids Center report stated that "when questioned about sexual contact [A.G.] denied anyone had touched his private area." R.G. stated that A.G. and his brother would normally be near each other at bedtime because they shared a bedroom. She said that the Defendant often would "hang out" in A.G.'s room with A.G. and his brother at night when she and her husband were at home. She said that she could not recall whether the door to their room was open or closed when the Defendant was in there with them. R.G. testified, "There was a time when I walked in and [the Defendant] and [A.G.] were under the covers in the bedroom. . . . And [A.G.'s brother] was sitting on the floor." She said that she did not say anything when she saw the Defendant and A.G. under the covers. R.G. stated that A.G. adored the Defendant and was not afraid of him because they were friends. She said that she never saw any kind of sexual contact between the Defendant and A.G. She testified that A.G. saw a mental health professional in 1995 because he missed his father, who was stationed in Korea at the time, and because A.G. was having suicidal tendencies.

On redirect examination, R.G. testified that she and her husband told "[A.G.] to tell the truth and to answer all the questions that anyone asks of him." She said that she may have told the Defendant that A.G. missed his dad and had suicidal tendencies. On recross-examination, R.G. testified that the prosecutors spoke with A.G. before he testified before the grand jury and three times before he testified at the Defendant's trial. She said that she had not talked with A.G. about the sexual abuse in the three years preceding the trial.

Michael Richard Ellis, an agent with the Florida Department of Law Enforcement in Tallahassee, Florida, testified that he interviewed the Defendant on July 17, 1998, in a conference

room located in the field office.[3]  He said that Special Agent Timothy Forrestall with the Federal Bureau of Investigation also interviewed the Defendant at that time.  Agent Ellis testified that the Defendant was arrested and read his <u>Miranda</u> rights before they interviewed him.  He said that the Defendant signed a <u>Miranda</u> rights waiver form and then spoke with him and Agent Forrestall.  Agent Ellis stated that he and Agent Forrestall interviewed the Defendant for about three and a half hours that evening until all three got tired and then they stopped the interview between 10:00 and 10:30 p.m.  He said that he and Agent Forrestall met with the Defendant on the morning of July 18, 1998, to continue the interview at the Leon County Jail in Tallahassee.  Agent Ellis testified that, within the first hour of that interview, the subject of A.G. came up.  The agent stated that the Defendant said that he was twenty years old at the time he had sexual contact with A.G. in Clarksville between 1997 and 1998.  Agent Ellis stated that the Defendant told them that, on one occasion, he baby-sat A.G. and the other children when A.G.'s parents had gone out.  The agent testified that the Defendant said that he and A.G. "ended up in [A.G.'s] bedroom."  The agent stated:

> [The Defendant] made reference to [A.G.] having a virtual pet game and that he had gone to [A.G.'s] house for the purpose of repairing that pet game[,] and while there, he and [A.G.] were sitting together and that he had placed his arm across [A.G.]. . . . [The Defendant] indicated that he had observed that [A.G.] then obtained an erection and that this resulted in discussions that were sexual in nature.

Agent Ellis stated that the Defendant told them that, after observing that A.G. had an erection, "he performed oral sex upon [A.G.]"  The agent explained, "[The Defendant] said that on two occasions he had performed oral sex upon [A.G.] and on one occasion, [A.G.] performed oral sex upon him."  The agent said that the Defendant admitted to having three sexual encounters with A.G.

Agent Ellis testified that, following this second interview with the Defendant, he gave the Defendant a legal pad and a felt tipped pen and told the Defendant "that . . . if he wanted to organize his thoughts, regarding the conversation that we had had, that he might take advantage and use that pen and pad that I have provided to him."  The agent stated that he returned to the Leon County Jail on the morning of July 19, 1998, and met with the Defendant for a couple of hours.  He testified that the Defendant gave him a handwritten note on legal paper that was signed by the Defendant and dated July 19, 1998.  The trial court allowed copies of the note to be distributed to the jury, and Agent Ellis then read the note:

---

[3]At a hearing outside the presence of the jury on the Defendant's motion to exclude the handwritten and post-arrest statements to Agent Ellis and Agent Timothy Forrestall of the Federal Bureau of Investigation, the agents explained that they were jointly investigating the use of the Internet to solicit young children for sex.  As part of the investigation, an undercover agent with the Florida Department of Law Enforcement represented herself as a twelve-year-old boy in an Internet chatroom.  The Defendant began significant dialog with the undercover agent posing as the young boy, and, on July 17, 1998, the Defendant traveled to Tallahassee for the purpose of engaging in sexual relations with the young boy.  As a result, the agents arrested the Defendant at the designated meeting place and took him to the Florida Department of Law Enforcement headquarters for questioning.  The Defendant was convicted in the United States District Court in Tallahassee of interstate travel for the purpose of engaging in sex with a minor and sentenced to two years in prison.

[A.G.], this was the case of hugging, etc., stimulated him in a different way than say hugging his father. [A.G.] was a happy kid even though he told me he wished his Mom and Dad paid more attention to him and not forced him to do things against his will (play sports that he didn't want to). [A.G.] wasn't extremely intelligent, but he wasn't stupid, your typical average American kid. We only had sexual contact maybe 2-3 times with a large amount in between incidents. I guess I started it the first time. He did thereafter. He told me he loved me. It seemed in his tone of voice he was just–more out of habit than meaning it, Signed [the Defendant], 19 July, 1998.

Agent Ellis stated that, after talking with the Defendant and taking his note, he went to Clarksville on July 21, 1998, and talked with Detective Billy Batson of the Clarksville Police Department about the Defendant's confession. He said that he had no direct contact with DCS.

On cross-examination, Agent Ellis said that he knew that the Defendant had been awake for a number of hours when he and Agent Forrestall started interrogating him, but he did not know the total number of hours. He stated that he and Agent Forrestall used a "bad cop/good cop routine" when they interrogated the Defendant. Agent Ellis said that he asked the Defendant for his cooperation during the interview. He explained, "I told him it was my experience that if he retained an attorney, that the attorney would not allow him to talk to us until some proper time in the process." The agent testified that a photograph of A.G. was found on the Defendant when they searched him in Tallahassee. Agent Ellis admitted that he prepared to testify by reading investigative reports that he made after he interviewed the Defendant. The agent stated that he would not have remembered the details of his interview with the Defendant four years ago without refreshing his memory with the investigative reports. Agent Ellis testified that he made the investigative reports from his handwritten notes, which "were shredded after we thought the case had been resolved."

The Defendant called Timothy Forrestall, a special agent with the Federal Bureau of Investigation, who testified that he was not aware that the Defendant had been awake for thirty hours at the time he arrested him in Tallahassee. Agent Forrestall stated that he and Agent Ellis interviewed the Defendant for three hours. He said that, during the interview, he showed the Defendant the photograph of A.G. that they found on the Defendant. The agent said that he and Agent Ellis asked the Defendant to identify the boy in the photograph and asked him "if he had done anything improper with that boy." Agent Forrestall testified that the Defendant knew A.G.'s date of birth, and, at that point, he thought "there was some probability" that the Defendant had sexual contact with A.G. The agent stated that, during the first interview session, the Defendant did not admit to having sexual contact with A.G.

On cross-examination, Agent Forrestall stated that he took no notes during the Defendant's interview, rather Agent Ellis took notes and prepared the investigative reports. Agent Forrestall stated that he could not remember in detail what the Defendant said during the interview because he did not take any notes, but he remembered that the subject of A.G. came up during the interview. He said that Agent Ellis gave the Defendant a pad and pen to write letters to the victim and the victim's family. The agent said that he did not participate in the Defendant's interview on July 19,

1998.

The Defendant, who was twenty-five at the time of trial, testified that he wrote the confession dated July 19, 1998. He stated that he wrote the confession "[t]o prevent [A.G.] from going through what he actually went through." The Defendant said that the statement he signed was not true, and he denied telling Agent Ellis and Agent Forrestall that he had sexual contact with A.G. The Defendant testified that he did go to A.G.'s house to help A.G. fix a virtual pet game, which needed new batteries, and he gave A.G. new batteries for the game. He denied telling the agents that he performed fellatio on A.G. and that A.G. performed fellatio on him. The Defendant admitted telling Agent Forrestall that he had sexual contact with A.G., but "it was touching only." He stated that he told Agent Forrestall that he touched A.G., even though that was not true, because he wanted the agent to stop yelling at him. The Defendant explained, "As soon as I said it, he sat down and Agent Ellis started questioning me instead of [Agent] Forrestall."

The Defendant testified that, in 1997, he worked as a computer technician for Liberty Computers in Clarksville, and, in 1998, he started a job at Columbia HCA. He stated that he lived with the Farr family across the street from A.G.'s house between 1997 and 1998. The Defendant said that, "Whenever I had free time, I went over to see how [A.G. and his family] were doing and things like that." He stated that, when he went to A.G.'s house, "[u]sually, I stayed in the living room and talked to [R.G.]." The Defendant explained that he built R.G.'s computer in 1996, and, "[w]hen I built the computer, I became better friends with them, and . . . I spent more time with them." He said that he went to A.G.'s house once or twice a month. The Defendant testified that he baby-sat for A.G.'s family no more than three or four times. He said that when he went to A.G.'s house, there was normally another adult in the house, such as A.G.'s mother or father. He stated that, in 1997 and 1998, he was friends primarily with the Farr family and A.G.'s family.

The Defendant testified that he liked kids because "[t]hey are funny and they see the world from a different perspective than we do." He said that kids are funny "[b]ecause they don't have to worry about all the things that adults have to worry about everyday." He explained that the majority of the people he worked with in the computer field "were very boring," so he enjoyed the spontaneity of children. The Defendant testified that, when he was at A.G.'s house in 1997 and 1998, he spent half the time with either A.G.'s mother or father and half the time with A.G. alone. He said that, normally, he and A.G. would "hang out" in A.G.'s room, which he shared with his brother. The Defendant said that they would usually play Nintendo in A.G.'s room. He explained that A.G. enjoyed playing a hockey game on Nintendo with the Defendant because A.G. could beat the Defendant. He testified that he "was never, ever in the house alone with [A.G.]," because if A.G.'s parents were not at home, A.G.'s brother and sister would be there. He said that A.G.'s brother would be in the bedroom with him and A.G. playing Nintendo. He said that he went in A.G.'s sister's room on two occasions, once to play a keyboard and another time to ask A.G.'s father a question. The Defendant stated that he was never alone with A.G. in A.G.'s sister's room. He denied touching A.G.'s private part or putting his mouth on A.G.'s private part in A.G.'s sister's room. The Defendant also denied that A.G. put his mouth on his private part in that room. He denied that he ever laid on A.G.'s bed with A.G., but he admitted that they often sat on the same bed

in A.G.'s room when they played video games. The Defendant denied getting under the covers with A.G. on his bed, but he said that A.G. would sometimes be under the covers while he was close to A.G. on the bed. The Defendant said that A.G. would lean up against him while they were sitting on the same bed. He explained that, occasionally, A.G. would fall asleep in his room, so he would lay A.G. on the bed and cover him up. The Defendant said that he would continue to sit on the bed and play video games after tucking in A.G. He explained that he was never alone with A.G. when A.G. was lying on the bed and he was sitting on the bed with him. The Defendant denied touching A.G.'s private part in A.G.'s room. He also denied that A.G. put his mouth on his private part or that he put his mouth on A.G.'s private part. The Defendant stated that he never touched A.G. in a sexual way.

The Defendant testified that A.G. acted like he loved him because "[a]s soon as I walked through the door, he would come flying at me. . . . [I]f he didn't realize I came in immediately, there were many times he would run in the living room and he would run circles around me until I picked him up." The Defendant said that A.G. was affectionate toward him because A.G. liked him, and he liked A.G. He stated that he loved A.G., and he said his relationship with A.G. "was like he was my little brother." The Defendant testified that A.G. was comfortable around him and often fell asleep leaning against the Defendant. He stated that he did not "feel anything sexual towards [A.G.] at all," and there was nothing to indicate that A.G. felt anything sexual toward him. The Defendant testified that he would play Nintendo with A.G. in his room because "[A.G.] would drag me back there. He would grab me by the hand and take off." He said that the door to A.G.'s room was never shut when he was in the room with A.G. He explained that anyone walking down the hallway of the house could see inside A.G.'s room when they were playing Nintendo. The Defendant said that R.G. often walked by the room when he came over, and she would come into the room many times to see what he and A.G. were doing.

The Defendant testified that he was arrested by Agent Ellis and Agent Forrestall on July 17, 1998, in Tallahassee. He said that he had been awake for thirty hours at the time he was arrested, and he was tired. He stated that, before that day, he had never been arrested. The Defendant testified that the agents took him into a conference room at the Florida Department of Law Enforcement headquarters. He said that Agents Ellis and Forrestall interrogated him for about three and a half hours. The Defendant stated that the agents interrogated him about A.G. for approximately one hour after the agents found a photograph of A.G. in his wallet. He said that Agent Forrestall "said that he knew that I had done some things with [A.G.]," and the Defendant responded that he "had done nothing to [A.G.]." He testified that the agents asked him if he had sex with A.G. "at least fifty different ways." The Defendant stated that Agent Forrestall told him that if he did not sign the Miranda rights form, "it could be worse for you. We would have to tell the Judge and the United States Attorney that you didn't want to cooperate with us and we will have to take you straight to jail." The Defendant said that Agent Forrestall "was very aggressive, very mean. He would yell and throw his notepad. He would get up in my face and make fists and slam it on the table." He explained that, after Agent Forrestall had an outburst and yelled at him, Agent Ellis would quietly take over and ask questions. The Defendant said that the agents had a "good cop/bad cop" routine, with Agent Ellis being the "good cop." He stated that the agents told him that, unless he cooperated

with them, A.G. would be subjected to physical exams and repeatedly interrogated until A.G. admitted to being raped. The Defendant said that the agents also told him that A.G. may be taken into state custody if the Defendant did not cooperate.

The Defendant testified that the agents then took him to the Leon County Jail, where he was placed on suicide watch. He said that, on July 18, 1998, Agents Ellis and Forrestall came to the jail to interview him a second time. The Defendant stated that, during the second interview, he "went from answering the questions truthfully to answering the questions . . . in a manner that they wanted to be answered." He said that he answered "yes" when asked if he had sexual contact with A.G. The Defendant explained, "I was going to do what I had to do to keep [A.G.] from going through what I had just went through that night. . . ." He said that Agent Forrestall "started yelling and screaming and getting louder and then I guess it was about an hour into the interview, I finally said yes, it happened." He stated that he never told them that he performed fellatio on A.G. The Defendant testified that Agent Ellis gave him a pad and a pen and asked him to write a paragraph about A.G., and he agreed to write about his involvement with A.G. He explained, "[Agent Ellis] said that the statement would ensure that things would go smoothly . . . ." The Defendant admitted to writing that he had sexual contact with A.G. about two to three times with a large amount of time between incidents, but he said that the statement was not true. He said that, on July 19, 1998, Agent Ellis read the statement and told him that he left out information about who started the sexual contact. The Defendant said that he wrote that he started the sexual contact on the first occasion, but that A.G. started the sexual contact on subsequent occasions. The Defendant testified that his recollection of the interrogations by the agents was "sort of fuzzy" because "[t]hat was one of the worst experiences that I have ever gone through in my life and it took quite a while to start remembering what happened." The Defendant testified that he gave false statements to the agents to stop Agent Forrestall from yelling at him and to prevent A.G. from having to go through interviews about the sexual abuse.

On cross-examination, the Defendant testified that he worked at Columbia HCA in Nashville in 1997 and 1998, and it took him about an hour to commute to work from Clarksville. He said that he spent most of his limited free time in the company of children because he found them pleasant and enjoyable. The Defendant stated that R.G. told him that A.G. was very upset when his father went to Korea in 1995. He denied spending his free time playing Nintendo games with children. The Defendant denied promising A.G. a Nintendo 64. He said he spent a large amount of money on computer equipment, in addition to paying for a car loan, insurance and gas. The Defendant admitted that he was in A.G.'s room with A.G. and his brother when the boys' parents were across the street. He denied being under the covers with A.G. on the bed. He testified that R.G. was mistaken when she said that she could not see from the kitchen area into A.G.'s room. The Defendant testified that A.G. was mistaken or lying about always shutting the door to his bedroom to keep the cool air in. He denied being in A.G.'s room alone with A.G. when the door was closed.

The Defendant testified that Agents Ellis and Forrestall were mean to him when they interrogated him in Florida. He said that Agent Forrestall was especially mean to him and yelled at

him most of the time. The Defendant admitted going to the restroom with Agent Ellis and taking some pills at the Florida Department of Law Enforcement. He said he took high doses of Tagamet, Halcion and Xanax in the restroom, and those drugs caused him to feel "spacey" and very dizzy. He said that those drugs caused him to "have very little recollection of what happened . . . ." The Defendant testified that he has "had lots of time to think about it," and he now remembers more about his interviews with the agents. He explained that his written statement that he sexually abused A.G. was not true. He said that he lied in the statement that he signed for Agent Ellis. The Defendant testified that Agent Ellis lied when he said that the Defendant admitted to having sexual contact with A.G. The Defendant said that Agent Ellis also lied when he said that the Defendant admitted to performing fellatio on A.G. and having A.G. perform fellatio on him. The Defendant admitted telling Agent Forrestall that he had sexual contact with A.G., but it was only touching. He said that he lied when he told Agent Forrestall that he had sexual contact with A.G.

Dr. William Bernet, a forensic psychiatrist and child psychiatrist, testified that he reviewed some of A.G.'s psychotherapy and medical records and some of the investigative records by Agent Ellis. Dr. Bernet stated that he also examined the Defendant's written statement and some other records regarding A.G. The doctor said that he interviewed the Defendant for about two and half hours. Dr. Bernet testified that he was never able to review the early statements that A.G. made regarding the sexual abuse. He explained:

> [A.G.] was interviewed early in this investigation by several different people and I haven't been able to see those records, and as far as I know, they don't exist at this point, or I don't actually know what records were originally made, but in any case, nobody has been able to provide to me the original interviews of [A.G.], which usually would have been very important to me in doing this kind of evaluation. Or the interviews conducted by DCS, for instance, I have not been able to see. Also, I have not been able to interview [A.G.] himself. Sometimes when I do evaluations, like this, I am able to interview the child and in this case, I have not been able to do that.

Dr. Bernet testified that children must be interviewed in a particular way in order to ensure that the children's statements are accurate and truthful. He said that "children don't always tell the truth when they make a statement . . . ." He explained that "research has been done to show that there are certain aspects or certain factors that seem to be consistent with a true allegation and there are other factors or aspects of the case that are consistent with a false allegation." The doctor said that, "First of all, you have to keep a really good record of the interview and the best way to do that, of course, is to make a tape, make an audio or videotape." Dr. Bernet testified that the interviewer must tell the child the rules for the interview and encourage the child to tell the truth, such as telling the child, "today we are talking about real life things, things that really happened." He said that the interviewer also must encourage the child to give a narrative account of what happened during the alleged abuse and avoid leading questions about the abuse. Dr. Bernet testified that "a fundamental part of the technique of interviewing children, is to help the child learn how to give a . . . free, narrative account and the reason why that is important in this case, is that as far as I can tell, that has never occurred

in this case." He explained that, after reviewing the different interviews with A.G., "as far as I can tell, [A.G.] has never given a simple . . . narrative account of being abused by anybody, including by [the Defendant]."

Dr. Bernet testified that a child may answer questions about sexual abuse in a certain way because "through interviewing or repetitive questioning, the child has come to adopt the opinion or the position of the interviewer, and the interviewer might be a parent, it might be a professional interviewer like a therapist." He explained that a child can be indoctrinated to make false statements about sexual abuse. Dr. Bernet stated that he was concerned that A.G. may have been indoctrinated to make false statements. He explained:

> [A.G.] was interviewed by a number of different people, by DCS, the police, by Our Kids, by Dr. Ruby, I think by the District Attorney, and as far as I can tell from the records that we do have, is [A.G.] repeatedly said that he had not been abused, although ultimately, he makes this little statement . . . about being touched on his peanut, only after a number of times of making denials. So that is something to think about as to whether or not he was the victim of interviewer suggestion. Now, I guess that I should mention that there are children who are simply frightened or scared or who are reluctant to make a statement initially and so sometimes, they don't make a statement until the second or third interview, so that is possible. But even then, . . . eventually when they do make a statement, then they should be able to give this free narrative that I mentioned before. . . .

Dr. Bernet explained that some children enjoy making up stories and engaging in fantasy, and those children were more likely to make false statements about sexual abuse.

Dr. Bernet testified that adults "also sometimes make false statements. In particular, what is perhaps the most troubling is that sometimes adults make confessions, they make statements to the police and they make confessions that are not true." He stated that some adults make voluntary false confessions to police, while other adults are coerced by police into making false confessions. He explained, "There are different reasons why a person might do this . . . and in fact, you know, I think what I have learned about what happened to [the Defendant], I think that he's probably an example of a coerced compliant false confession." Dr. Bernet described the Defendant as a "passive compliant person" who "is more likely to get kind of pushed into doing something that is not in his interests." The doctor stated that the Defendant's sleep deprivation contributed to the Defendant not thinking clearly during the interrogations. He explained, "[The Defendant] eventually got the idea that he would be better off . . . and [A.G] would be better off if he simply gave in and wrote that paragraph that you have seen."

On cross-examination, Dr. Bernet testified that he did not hear A.G. testify earlier in the trial and did not know whether A.G. was lying when he said that the Defendant sexually abused him. He stated that it was possible that A.G. told the truth about being sexually abused by the Defendant. The doctor said that it would have been helpful if he could have interviewed A.G., but R.G. refused to

-11-

allow A.G. to be interviewed. Dr. Bernet testified that promising to buy an expensive video game system for a child "is the kind of thing that could conceivably be part of an actual abuse situation in the sense that it could be part of grooming, [where] the actual pedophiles groom their victims by doing nice things for them." The doctor stated that he believed that the Defendant made a false confession because of his "passive personality style" and the way in which he was interrogated by the agents.

The State then called Agents Forrestall and Ellis as rebuttal witnesses. Agent Forrestall testified that he did not scream at the Defendant or pound his fists on the table during the interviews with the Defendant in Florida. The agent stated that he was calm and business-like when he was interviewing the Defendant. Agent Ellis testified that he and Agent Forrestall were calm and casual when they interviewed the Defendant in Florida. He said that he and Agent Forrestall "obviously wanted to identify that we had control of the situation, but we certainly weren't abusive." Agent Ellis denied that they screamed or yelled at the Defendant and denied that Agent Forrestall beat his fists on the table. Agent Ellis stated that he took notes on a yellow legal pad, but he did not throw the legal pad down in front of the Defendant.

After the presentation of evidence and closing arguments, the jury found the Defendant guilty of three counts of aggravated sexual battery.

## B. Sentencing Hearing

The following evidence was presented at the Defendant's sentencing hearing. The State introduced the Defendant's presentence report into evidence. The Defendant testified that he was twenty-five years old at the time of the sentencing hearing. He stated that he was sorry that his case took four years to be resolved, because "[e]verybody has gone through all kinds of stuff . . . [and] nobody should have to go through it. And that includes me." The Defendant explained that he was sorry that A.G. had to testify at his trial. He stated, "[H]e was terrified when he had to testify. It wasn't something he wanted to do. . . . I was very sorry he had to go through that. I've done everything I could to prevent him from having to do that from the very beginning."

The State requested that the trial court apply the following enhancement factors under Tennessee Code Annotated section 40-35-114 (1997 & Supp. 2002): (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (16) the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. The State also requested that the trial court order the Defendant's sentences to be served consecutively under Tennessee Code Annotated section 40-35-115(b)(5) (1997). The Defendant requested that the trial court order the Defendant's sentences to be served concurrently because the time span of the abuse was relatively short and there was no evidence of any residual physical or mental damage to the victim. The Defendant also requested that the trial court apply the following mitigating factors under Tennessee Code Annotated section 40-35-113 (1997): (1) the defendant's criminal conduct neither caused nor threatened serious bodily injury; and (6) the defendant, because

-12-

of youth or old age, lacked substantial judgment in committing the offense.

After considering the evidence presented at the sentencing hearing, the trial court found enhancement factors (2) and (16) to be applicable to the Defendant's convictions. Tenn. Code Ann. § 40-35-114. The trial court then found that mitigating factor (1) applied to the Defendant's convictions. Tenn. Code Ann. § 40-35-113. The court found that, "while [the Defendant] has expressed regret concerning the process he has not indicated any sort of remorse for the crimes for which he has been convicted. There's no indication of any contrition on his part for engaging in the acts for which he was convicted." The trial court sentenced the Defendant to eight years for each count of aggravated sexual battery and ordered the Defendant's sentences to run consecutively under Tennessee Code Annotated section 40-35-115(b)(5), for an effective sentence of twenty-four years in prison. The Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) insufficient evidence exists in the record to support his convictions; (2) the trial court erred by not requiring the State to elect the offenses it wished to submit for consideration by the jury; (3) the trial court erred under Tennessee Rule of Evidence 404(b) by admitting a law enforcement officer's testimony of the Defendant's uncharged conduct; (4) the trial court erred by permitting a law enforcement agent to testify about a recorded recollection under Tennessee Rule of Evidence 803(5); (5) the trial court erred under State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), and Tennessee Rule of Criminal Procedure 26.2 by denying the Defendant's motion to prohibit testimony of the victim and instead giving an instruction at the end of the trial after the alleged victim testified regarding the missing tape-recorded statements of the victim; (6) reversible error occurred when the State failed to disclose, preserve and turn over a law enforcement official's notes made during the initial interrogation of the Defendant; (7) the trial court erred by allowing the State to submit an insufficient Bill of Particulars and to deviate from its Bill of Particulars by submitting evidence that another witness was present during one alleged touching of the victim; (8) the trial court erred in denying the Defendant's motion to suppress his written and oral statements made to law enforcement officials in Florida; (9) the trial court erred by failing to instruct child abuse as a lesser-included offense of child rape and aggravated sexual battery; (10) the State's closing arguments were so improper that they infected the trial with unfairness and denied the Defendant due process; (11) the trial court erred by interrupting the natural flow of jury deliberations to give supplemental instructions; and (12) the trial court erred in ordering the Defendant to serve his sentences consecutively.

### A. Sufficiency of the Evidence

First, the Defendant contends that the evidence presented at trial was insufficient to support his convictions for aggravated sexual battery. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443

U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of three counts of aggravated sexual battery. Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and] [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (1997). "Sexual contact" includes "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (1997). "Intimate parts" includes "the primary genital area, groin, inner thigh, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's convictions. A.G. testified that the Defendant touched his penis on at least four separate occasions. The first incident of sexual contact occurred when the Defendant put his hands under A.G.'s pajamas and touched his penis with his hands while they were in A.G.'s room and his parents were at home. The next incident of touching occurred when the Defendant again put his hand under A.G.'s pajamas and touched his penis with his hands while they were in A.G.'s room, A.G.'s brother was on the floor playing Nintendo, and A.G.'s parents were at Sherry Dowker's house. The third incident of sexual contact occurred when the Defendant put his mouth on A.G.'s penis while they were in A.G.'s sister's bedroom. The fourth incident of sexual contact occurred when the Defendant made A.G. put his mouth on the Defendant's penis while they were in A.G.'s sister's bedroom. A.G. testified generally to another incident of sexual touching by the Defendant with his hands, but the victim was not specific.

The Defendant made the following written statement to the law enforcement officials in Florida: "[A.G.], this was the case of hugging, etc., [that] stimulated him in a different way than say

-14-

hugging his father. . . . We only had sexual contact maybe 2-3 times with a large amount in between incidents. I guess I started it the first time. He did thereafter. . . ." Agent Ellis testified that the Defendant told him that "he and [A.G.] were sitting together and that he had placed his arm across [A.G.]. . . . [The Defendant] indicated that he had observed that [A.G.] then obtained an erection and that this resulted in discussions that were sexual in nature." Agent Ellis stated that the Defendant told them that, after observing that A.G. had an erection, "he performed oral sex upon [A.G.]." The agent explained, "[The Defendant] said that on two occasions he had performed oral sex upon [A.G.] and on one occasion, [A.G.] performed oral sex upon him." The agent said that the Defendant admitted to having three sexual encounters with A.G. Moreover, the evidence was undisputed that A.G. was six or seven years old when the Defendant sexually molested him. Therefore, based upon this evidence, we conclude that a rational trier of fact could have found the essential elements of three counts of aggravated sexual battery beyond a reasonable doubt.

## B. Election of Offenses

The Defendant next contends that the trial court erred by not requiring the State to elect the offenses that it wished to submit for consideration by the jury. The Defendant contends that A.G. testified to six separate instances of sexual contact, and, at the end of the trial, the State "did not choose which of the six sexual contacts . . . the jury should consider when deciding whether to convict the [D]efendant of the three charged offenses. . . . There can be no assurance . . . that the jury reached a unanimous verdict as to each of the three counts of the indictment." The State argues that no election issue exists as to the two child rape counts because A.G. testified about only two instances of child rape. The State contends that, although A.G.'s testimony suggested more than one instance of touching, he was specific as to only one instance that occurred when his parents were at Sherry Dowker's house, and the State elected during closing argument that specific instance of sexual touching. Therefore, the State contends that its failure to elect at the close of its case-in-chief was harmless.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993)). The election requirement "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citing Brown, 992 S.W.2d at 391); see Kendrick, 38 S.W.3d at 568. The Tennessee Supreme Court explained that "'[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence.'" Kendrick, 38 S.W.3d at 568 (quoting Shelton, 851 S.W.2d at 137). Moreover, the election requirement serves other interests as well: "it enables a defendant to prepare for a specific charge; it protects a defendant against double jeopardy; it enables the trial court to review the weight of the evidence in its capacity

-15-

as thirteenth juror; and it enables the appellate court to review the legal sufficiency of the evidence." Id.

"The necessity of requiring the State to make an election of the particular offense it will rely on for conviction . . . is . . . fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, "there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court held that "where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible," but, at the close of proof, the State must elect the facts upon which it is relying for conviction. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994).

In cases such as this one, where the victim has testified to several incidents of sexual conduct beyond that charged in the indictment, the State "must either limit the testimony of prosecuting witnesses to a single event, or prepare the case so that an election can be made before the matter is submitted to the jury to decide." Kendrick, 38 S.W.3d at 568 (citing Shelton, 851 S.W.2d at 137). The requirement of election and a jury unanimity instruction exists even though the defendant has not requested them. Burlison, 501 S.W.2d at 804. Failure of the State to elect offenses when the proof requires an election is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. See State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000); Shelton, 851 S.W.2d at 138-39.

Recognizing the practical difficulties in applying the election requirement in cases involving child sexual abuse, the Tennessee Supreme Court provided the following guidelines:

> By insisting upon election, we emphasize that the state is not required to identify the particular date of the chosen offense. . . . [S]uch a requirement would make impossible the prosecution of criminal acts committed against young children who are the frequent victims of cognate crimes and crimes involving the age of consent. However, a particular offense can often be identified without a date.

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. See e.g., State v. Fears, 659 S.W.2d 370, 374 (Tenn. Crim. App. 1983). Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation under Burlison to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure

-16-

that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision. . . .

As noted above, in cases where a specific date cannot be supplied, the jury's consideration must be focused on one or more charged offenses by some effective means of election, in order to ensure unanimity on those offenses and no others.

Shelton, 851 S.W.2d at 137-38.

In Brown, this Court held that an enhanced unanimity instruction is required in certain instances where the State is required to make an election. Brown, 823 S.W.2d at 583. This Court held:

[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts. The assessment of this potential would involve consideration of the allegations made and the statutory offense charged, as well as the actual evidence presented. Such an assessment is needed because not every fact, circumstance or theory of guilt will call for an instruction greater than the general one.

Id. "It is only when the evidence can be placed in 'distinct conceptual groupings,' of which each would constitute a crime under the same count, does the concern for unanimity arise." Id. at 583-84 (citing United States v. Gipson, 553 F.2d 453, 458 (5th Cir. 1977)). However, the Tennessee Supreme Court held that an enhanced unanimity instruction "is not required even in cases where the proof does indicate more than one offense. The election requirement itself alleviates any unanimity concerns. Those states which require an enhanced unanimity instruction appear to rely upon it instead of, not in addition to, an election requirement." Johnson, 53 S.W.3d at 635 (citing State v. Greene, 623 A.2d 1342, 1344-45 (N.H. 1993); State v. Weaver, 964 P.2d 713, 720 (Mont. 1998)). Therefore, although the Supreme Court did not overrule this Court's holding in Brown, the Johnson Court clearly held that an enhanced unanimity instruction is not required because the election requirement alleviates any unanimity concerns. Id.

In this case, the Defendant was charged with two counts of child rape and one count of aggravated sexual battery. The indictment, which the State read to the jury at the beginning of the trial, set forth the charges as follows:

COUNT 1:
[D]uring the years 1997 and 1998, and in the State and County aforesaid, [the Defendant] unlawfully, feloniously, intentionally and knowingly did have sexual

-17-

contact with [A.G.], to-wit: by touching the said [A.G.'s] penis, for the purpose of sexual arousal and gratification, the said [A.G.] being a person under thirteen (13) years of age, in violation of TCA 39-13-504 and against the peace and dignity of the State of Tennessee. . . .

COUNT 2:
[D]uring the years 1997 and 1998, and in the State and County aforesaid, [the Defendant] unlawfully, intentionally, feloniously and knowingly did sexually penetrate [A.G.], to-wit: fellatio, by inserting his penis in victim's mouth, the said [A.G.] being a person less than thirteen years of age, in violation of TCA 39-13-522 and against the peace and dignity of the State of Tennessee. . . .

COUNT 3:
[D]uring the years 1997 and 1998, and in the State and County aforesaid, [the Defendant] unlawfully, intentionally, feloniously and knowingly did sexually penetrate [A.G.], to-wit: fellatio, by inserting the said victim's penis in his mouth, the said [A.G.] being a person less than thirteen years of age, in violation of TCA 39-13-522 and against the peace and dignity of the State of Tennessee. . . .

A.G. testified that, on one occasion when the Defendant was baby-sitting him, the Defendant reached under A.G.'s pajamas and touched his "private part" with his hand when they were in his bedroom, which he shared with his brother. He stated that his parents were at home when the Defendant first touched his penis. A.G. said that the Defendant touched his penis on another occasion when his parents were at "Ms. Sherry's house" across the street. He testified that, while his parents were across the street at "Ms. Sherry's house" and his brother was on the floor of the bedroom playing video games, the Defendant, who was on the bed with A.G., reached under A.G.'s pajamas and touched his penis. A.G. testified that, on a different occasion in his sister's room, the Defendant put his mouth on A.G.'s "front private part." He stated that, on another occasion in his sister's room, the Defendant made A.G. put his mouth on the Defendant's penis and touch the Defendant's penis with his hand. A.G. testified that he could not remember how many times the Defendant touched his penis or he touched the Defendant's penis. Agent Ellis testified that the Defendant admitted that he performed oral sex on A.G. twice and that A.G. performed oral sex on him once. In the Defendant's written statement, the Defendant admitted to having sexual contact with A.G. two to three times.

At the close of the State's case-in-chief, the State failed to elect which set of circumstances it was relying upon to support each charge. However, for the aggravated sexual battery charge in the indictment, the State argued in its closing argument that the Defendant reached under A.G.'s pajamas and touched A.G.'s penis while A.G.'s parents were at Sherry Dowker's house. The State argued as follows:

What was [A.G.] sure of? He was sure he was wearing his pajamas. He had his PJ's on. He was sure the door was closed because the boys like it cool and he

-18-

was sure on one of these occasions his Mom and Dad were at Ms. Sherry's. Absolutely, a bolt of lightning, [the Defendant] remembers the Mrs. Sherry thing too? Does that corroborate [A.G.]? Yes, the State submits that it does.

He was sure that his front private part was felt under his pajama bottoms and he was sure that he put his mouth on [the Defendant's] penis and he was sure [the Defendant] put his mouth on [A.G.'s] penis.

The trial court gave the following jury instruction regarding unanimity of verdicts:

### MULTIPLE COUNTS: FINDING ON EACH REQUIRED

The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. The defendant may be found guilty or not guilty on any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict. . . .

### JURY: DELIBERATION

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. . . .

The trial court did not give any further instructions regarding the election of offenses.

The State argues that no election issue arose as to the two child rape counts because A.G. testified about only two instances of child rape. The Defendant contends that A.G. testified about three incidents of child rape, thereby requiring the State to elect which incidents should be considered for the two child rape charges. After thoroughly reviewing the record, we agree with the State that no election issue arose as to the two child rape counts.

The Defendant contends that A.G. testified about three incidents of child rape. However, a careful examination of the transcript shows that A.G. only testified about two incidents of child rape. A.G. testified about two incidents of child rape on direct examination: (1) the Defendant put his mouth on A.G.'s penis in A.G.'s sister's room; and (2) the Defendant made A.G. put the Defendant's penis in his mouth while they were in A.G.'s sister's room. On cross-examination, A.G. confirmed that he told the Grand Jury that the Defendant put his mouth on A.G.'s private part and that A.G. put his mouth on the Defendant's private part. Immediately following the questions regarding what A.G. told the Grand Jury about the oral sex incidents, defense counsel further asked A.G., "Could you tell me *again* what you said happened when your parents were at Ms. Sherry's?" (emphasis added). A.G. replied that he and the Defendant went into A.G.'s sister's room "[a]nd then he put his mouth on my private part." We conclude that this testimony does not describe a third incident of child rape, rather it is a clarification of A.G.'s earlier testimony regarding the two incidents of child rape. Although he did not testify about this detail on direct examination, A.G. clarified that, when the

Defendant put his mouth on A.G.'s penis, his parents were at "Ms. Sherry's house."

The Defendant also contends that Agent Ellis' testimony regarding the Defendant's admission that he performed oral sex on A.G. twice and that A.G. performed oral sex on him once created an election problem. However, Agent Ellis' testimony did not contain specific details about the incidents of child rape like the testimony of A.G., and the testimony only regarded the Defendant's admission to performing these acts. A.G. specifically detailed each incident of child rape in accord with the two charges in the indictment. The charges in the indictment, which were read to the jury, specifically set forth the type of child rape charged in each count. The indictment states that, in Count 2, the Defendant penetrated the victim by "fellatio, by inserting his penis in victim's mouth," and, in Count 3, the Defendant penetrated the victim by "fellatio, by inserting the said victim's penis in his mouth." Therefore, we conclude that no election issue arose regarding the two counts for child rape because A.G.'s testimony about the two incidents of child rape corresponded exactly with the charges in the indictment, thereby ensuring unanimous verdicts on those counts. Thus, we conclude that the State was not required to elect offenses for the two aggravated sexual battery convictions under counts two and three, because these convictions were clearly based on the testimony of the two incidents involving oral sexual contact.

As for the aggravated sexual battery charge in Count 1, we conclude that the trial court erred by failing to require the State to elect which incident of sexual touching should be considered by the jury in deliberating on that charge. A.G. testified specifically about two incidents of sexual touching by the Defendant, and he testified generally about one incident of sexual touching. The State did not limit A.G.'s testimony to the offenses charged in the indictment. Instead, the State allowed A.G. to testify to more than one act of aggravated sexual battery. While the State claims that it "effectively elected" during its closing argument which incident of sexual touching it intended to rely upon for the aggravated sexual battery charge, we respectfully disagree. The State's closing argument did not explicitly elect one of the three incidents of sexual touching described by A.G.; rather, the State merely described details of A.G.'s testimony pertaining to two similar incidents of sexual touching and did not even mention the requirement of election of offenses.[4] The trial court failed to take precautions to ensure that the jury deliberated over the particular charged offense and instead created the possibility of a "patchwork verdict" based on the different incidents of sexual touching described by A.G. See Kendrick, 38 S.W.3d at 568. The trial court should have required the State to elect which incident it wanted to be considered for that count in the indictment.

Having found error, we now must conduct a harmless error analysis. The failure to elect can be harmless beyond a reasonable doubt in an appropriate case. Adams, 24 S.W.3d at 294; Shelton, 851 S.W.2d at 138-39. That is, the evidence may be of such a quality that no real risk of a patchwork or "grab bag" verdict exists. Shelton, 851 S.W.2d at 138. After thoroughly reviewing the record, we conclude that the trial court's error in failing to require the State to elect the offense for the

---

[4]We note that, even if the State had elected during its closing arguments, this election of offenses would not have satisfied the requirements of Burlison, 501 S.W.2d at 804. State v. Ellis, 89 S.W.3d 584, 594 n.2 (Tenn. Crim. App. 2000). The Ellis Court noted that any error in the *timing* of the State's election may be harmless. Id.

aggravated sexual battery charge was not harmless.  A.G. testified that, on one occasion when the Defendant was baby-sitting him, the Defendant reached under A.G.'s pajamas and touched his "private part" with his hand when they were in his bedroom and his parents were at home.  A.G. testified that, on another occasion, the Defendant touched his penis under his pajamas while they were in his bedroom, his brother was playing Nintendo on the floor, and his parents were at "Ms. Sherry's house."  The jury may have used either of these incidents to convict the Defendant of aggravated sexual battery.  By not requiring the State to elect which incident of sexual touching it intended the jury to consider for the aggravated sexual battery charge, the trial court created a serious risk of a patchwork or "grab bag" verdict on that charge.  Accordingly, we reverse the Defendant's conviction and sentence for aggravated sexual battery in Count 1.

### C.  Admissibility of Uncharged Conduct Testimony

The Defendant contends that the trial court erred under Tennessee Rule of Evidence 404(b) by admitting Agent Ellis' and A.G.'s testimony regarding uncharged conduct.  The Defendant argues that Agent Ellis' testimony regarding the Defendant's admission that he performed oral sex on A.G. twice and that A.G. performed oral sex on the Defendant once was improper under Tennessee Rule of Evidence 404(b) because it was evidence of uncharged conduct.  Likewise, the Defendant argues that the trial court erred by allowing A.G. to testify to six counts of sexual abuse instead of just three because that was evidence of uncharged conduct.  After thoroughly reviewing the record, we conclude that this issue has been waived because the Defendant failed to object to this testimony at trial and failed to include this issue in his motion for new trial.  Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); see State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).  Therefore, we conclude that this issue is without merit.[5]

### D.  Admissibility of Agent Ellis' Testimony

The Defendant next contends that the trial court erred by permitting Agent Ellis to testify about a recorded recollection under Tennessee Rule of Evidence 803(5).  The Defendant argues that Agent Ellis' testimony was inadmissible as a present recollection refreshed under Tennessee Rule of Evidence 612.  In his appellate brief, the Defendant contends that Agent Ellis' testimony mirrored

---

[5]We note that, even if this issue was not waived, it is without merit.  Where an indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible, but, at the close of proof, the State must elect the facts upon which it is relying for conviction.  Rickman, 876 S.W.2d at 828.

his written "investigative report," so "he did not have an independent recollection refreshed of [the Defendant] admitting the details but only read and memorized this investigative report for his testimony." The State argues that Agent Ellis' testimony was not present recollection refreshed, so the trial court did not abuse its discretion by admitting his testimony. After thoroughly reviewing the record, we agree with the State.

During Agent Ellis' testimony on direct examination, the Defendant's counsel objected to Agent Ellis' testimony about the Defendant's statements with regard to sexual contact with the victim. The following exchange occurred at a bench conference outside the hearing of the jury:

> MS. DENSON: Your Honor, it appears to me that he is reading directly from his notes. It sounds like this is past recollection recorded type situation? That was my objection as to foundation. I would like, if anything, is to establish his past recollection recorded?"

> THE COURT: He doesn't have anything in front of him. He is being responsive to the questions that are asked. He doesn't have anything in front of him. He is not reading anything. Whether he is reciting from memory or not, I have no way of knowing, but he is not reading anything? I don't understand the basis of your objection? What are you saying that he is doing that he shouldn't be doing?

> MS. DENSON: I am saying that he is testifying not from his memory of the events that happened, his independent memory; he's testifying based . . . only on his notes?

> THE COURT: That is something that you can go into him with on cross-examination, but so far he's been responsive to the questions that are asked and so, your objection is overruled now. If you want to question him on cross-examination about what you contend he is doing, you are free to do that, but until he does something that makes me believe he's reading from a prepared script, he [is] just responding to questions?

On cross-examination, Agent Ellis admitted to preparing for his testimony by reading the investigative report that he made following the interviews with the Defendant. Agent Ellis stated that, without the investigative report, he would not have been able to recall specific details about what the Defendant said during the interviews. The agent admitted that he read the investigative report prior to trial to refresh his memory about what the Defendant said during the interviews.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). In making these decisions, the trial court must consider "the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785

S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Tennessee Rules of Evidence 612 and 613 establish the circumstances and procedures for refreshing the memory of a witness using a prior statement of the witness. Tennessee Rule of Evidence 612 explains the procedures when a witness uses a writing to refresh his or her memory:

> If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

The Advisory Commission Comment to Rule 612 explains the foundation necessary and procedure to be used when the memory of a witness is refreshed by a writing:

> Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn. R. Evid. 612, Advisory Comm'n Cmt. Tennessee Rule of Evidence 612 only applies if a witness uses a writing while testifying. "By its express terms, Rule 612 pertains only when a witness uses a writing 'while testifying' to refresh memory for the purpose of testifying. Rule 612 does not apply to a writing read before trial if the writing is not also used while the witness is on the stand." Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 6.12[3][b] (4th ed. 2000).

Tennessee Rule of Evidence 613 governs the use and admissibility of the prior statement of a witness. Rule 613 provides in pertinent part:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is

afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Tennessee Rule of Evidence 803(5), an exception to the hearsay rule, explains the limited circumstances under which the prior statement may be entered as an exhibit in a trial:

Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The Advisory Commission Comment to Tennessee Rule of Evidence 803(5) explains the showing which must be made before the prior statement of a witness may be used to refresh the recollection of the witness at trial:

The proposed rule recognizes the traditional Tennessee hearsay exception for past recollection recorded, but it expands common law in two respects. It allows the admissibility of the contents of a document reflecting past recollection recorded even though the witness has some recollection of the recorded facts but not enough to testify "fully and accurately." Second, it permits the witness to adopt a record made by another not acting under the witness's supervision. The safeguard is the requirement of adoption at the time when the witness could vouch for the document's correctness.

Tenn. R. Evid. 803(5), Advisory Comm'n Cmt. For past recollection recorded under Rule 803(5), "the witness's memory is effectively useless; the witness does not remember the event and, accordingly, cannot testify from present memory." Neil P. Cohen, *supra*, § 8.10[2][c]. In such cases, "Rule 803(5) establishes a hearsay exception which admits into evidence a writing made or adopted by the witness when the matter was fresh in the witness's memory and that describes the event at issue." Id.

In this case, Agent Ellis read the investigative report before he testified at the trial to prepare for his testimony, and the report was never used while the agent was on the stand. Therefore, Tennessee Rule of Evidence 612 was not applicable. Moreover, Agent Ellis' testimony was not past recollection recorded because the agent did not need to have his memory refreshed with a prior memorandum or record during his testimony. The State did not seek to read the investigative report into evidence under Rule 803(5), rather Agent Ellis testified from memory about what the Defendant said during the interviews in Florida. Therefore, Tennessee Rule of Evidence 803(5) was not applicable. Accordingly, we conclude that the trial court did not abuse its discretion by admitting

-24-

Agent Ellis' testimony.  This issue is without merit.

### E.  The Missing Prior Recorded Statement of the Victim

The Defendant next contends that the trial court erred in refusing to prohibit testimony of the victim under the balancing test of State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), and under Tennessee Rule of Criminal Procedure 26.2(e), because DCS lost the victim's prior taped statements and the State was unable to provide them to the Defendant during discovery.  Prior to trial, the Defendant, relying on Ferguson,  filed a motion to compel discovery of the victim's prior recorded statement to DCS or to suppress the victim's testimony if such discovery was not provided.  In his motion, the Defendant contended the following:

> In the present case, the missing evidence is the recorded and transcribed interview of the victim by the Department of Children's services, which likely contained denials of sexual contact by the child.  Denials of sexual contact would be valuable impeachment evidence, which would be material to preparation of the defense and may lead to entertain a reasonable doubt about [the Defendant's] guilt.

The Defendant argued that the State should have made efforts to protect the prior recorded statement of the victim because "in sexual abuses cases where there is no physical or eyewitness testimony to the abuse, other than the alleged victim, the prior statements of the alleged victims are of utmost importance."  He further contended that allowing the victim to testify despite the State's loss of the victim's prior recorded statement "would result in a fundamentally unfair trial for the [D]efendant."  Therefore, the Defendant requested that the trial court "either dismiss Counts 3, 4, and 5 of the indictment, or suppress testimony of the alleged victim A.G.  At the very least the court should provide an instruction as set forth in Ferguson."

The day before the Defendant's trial began, the trial court conducted a hearing on the Defendant's pre-trial motions.  The State acknowledged that the victim's prior recorded statement to a DCS case worker had been lost.  The State introduced a copy of an examination report of A.G. from the Our Kids Center dated August 3, 1998, into evidence.  The report stated, in pertinent part, as follows:

> [A.G.] was referred by Deanna Groves [of DCS] on 7/24/98.  Ms. Groves reports that the alleged perpetrator has admitted to three episodes of penile anal penetration with ejaculation.  The last known sexual contact was over a week ago.  She further reports that [A.G.] has been interviewed by the Department of Children's Services and has not disclosed much detail about the sexual contact. . . .

The State then introduced an affidavit from Amelia B. Wallace of DCS into evidence.  The affidavit stated the following:

> I, Amelia B. Wallace, being duly sworn doth sayeth as follows:

That the [A.G.] Child Protective Services file concerning the sexual abuse of [A.G.] by [the Defendant], is not to be found in the Department of Children's Services archives. This was a July 1998 investigation, which began as a referral describing statements made by [the Defendant] while he was incarcerated in a Tallahassee jail. The entire file was lost and all efforts to find it have failed. This file was closed after [the Defendant] was indicated as a sexual perpetrator. Some writing has been replicated from general information in other victim records, computer print-offs, and forms.

This file may have been lost when they [sic] were in storage at the Department of Human Services awaiting transfer to the Department of Children's Services. Central Personnel from the Department of Children's Services mistakenly moved all files causing them to be placed in a confusing lack of order. This occurred in 1999.

An effort to place these files in a semblance of order over a period of many months has had limited success.

After this event many files have not been found. Another problem arose when support staff were allowed to file files without proper training. There is no central file clerk. The filing system has moved from a file tabbed with family name, then later by children's name, now back in the family names once again.

Some files are removed from our office for audit purposes, appeals, criminal court cases, criminal investigations, complaints from central office, CART (Child Abuse Review Team) and CPIT (Child Protective Investigation Team) meetings.

I have exhausted all efforts to find this file.

The State told the trial court that it contacted Deanna Groves, who was not available to testify, and she stated that she did not have any recollection of the interview with A.G. The State admitted "that there was negligence involved here on the part of the Department of Children's Services. . . . The State would submit that through mere simple negligence, this huge bumbling dinosaur has lost its file among what I suppose are thousands of files . . . that were moved . . . ." The State requested that, instead of suppressing A.G.'s testimony, the trial court craft a jury instruction that "basically says the Department of Children Services was negligent. As a result of their negligence, the file was lost. As a result of the file being lost, an audio tape recording apparently was lost, as well as the transcript. And let the jury decide . . . how significant that is?"

The trial court found that "[t]he sufficiency of other evidence cannot be considered by this Court at this time because I haven't heard it, so we'll come back to this motion after we exhaust everything that there is for this Court to consider." Following the presentation of evidence at the Defendant's trial, the trial court found that:

[A]fter hearing the evidence to this point, the Court is now capable of considering the factor, the Ferguson factor of the sufficiency of the evidence, along with the other factors that the Court has already made reference to. And I [am] denying the Defendant's motion to dismiss, but I am going to fashion an instruction to the jury about the fact that the file was lost.

The trial court instructed the jury regarding the lost file as follows:

**DUTY TO PRESERVE EVIDENCE**

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Exculpatory evidence is evidence which is favorable to the defendant.

In this case, the Department of Children's Services has acknowledged that it lost its file which contained information about the alleged victim, including an interview with the alleged victim and statements made by him about this case.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

### 1. **State v. Ferguson**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[6] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976). The evidence in both Brady and Agurs was "plainly exculpatory" evidence, which differs from the evidence in the case under submission, which is "allegedly exculpatory."

The Tennessee Supreme Court adopted a balancing approach to determine the consequences that flow from the State's loss or destruction of allegedly exculpatory evidence in Ferguson, 2 S.W.3d 912. In Ferguson, the Court held that the first step in the balancing analysis is to "determine whether the State had a duty to preserve the evidence. Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. at 917 (citing Brady, 373 U.S. at 87; Agurs, 427 U.S. at 110-11). The Court

_____

[6]"As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." Ferguson, 2 S.W.3d at 914, n.3 (citing Lofton v. State, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994); Watkins v. State, 393 S.W.2d 141, 144 (Tenn. 1965); Betts v. Brady, 316 U.S. 455, 462 (1942)).

clarified the boundaries of the State's duty to preserve evidence by quoting California v. Trombetta, 467 U.S. 479 (1984), which held:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the Defendant would be unable to obtain comparable evidence by other reasonably available means."

Ferguson, 2 S.W.3d at 917 (quoting Trombetta, 467 U.S. at 488-89).

The Court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." Id. Accordingly, those factors include: "(1) the degree of negligence involved;[7] (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917. "If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges." Id. However, dismissal is but one of the trial judge's options. Id. "The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction." Id. The Ferguson Court suggested the following jury instruction in a case where the State lost or destroyed "allegedly exculpatory" evidence:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence. If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Id. at 917, n.11 (citing Trombetta, 467 U.S. at 489; State v. Willits, 393 P.2d 274, 276 (Ariz. 1964)).

---

[7]This factor presumes negligence in the loss or destruction of the evidence. Should the proof show bad faith, the trial judge may consider such action as may be necessary to protect the defendant's fair trial rights.

In this case, we must first determine whether the State had a duty to preserve A.G.'s prior recorded statement to DCS and whether the State failed in that duty. According to the Our Kids Center examination report, "[A.G.] has been interviewed by the Department of Children's Services and has not disclosed much detail about the sexual contact." Therefore, the lost tape recording and transcript of A.G.'s statement to DCS may have had exculpatory value because, in the statement, A.G. apparently did not disclose "much detail" about the abuse. Depending upon what A.G. said in the statement, the Defendant may have used the prior recorded statement to impeach A.G. during cross-examination. Further, the statement could have been material to the preparation of the Defendant's defense. Thus, the State had a duty to preserve A.G.'s prior recorded statement to DCS as "potentially exculpatory evidence." Ferguson, 2 S.W.3d at 918. By losing A.G.'s file, the State breached this duty. Accordingly, we must consider the three factors set forth in Ferguson to decide whether the trial court erred in failing to suppress A.G.'s testimony and instead crafting a jury instruction regarding the missing evidence.

The first factor to consider in determining what consequences should flow from the State's breach of duty is the degree of negligence involved. Id. at 917. In his appellate brief, the Defendant contends that "[f]iles were not lost for the four of the five alleged victims that admitted sexual contact to some extent. The recorded, transcribed interview of the one alleged victim who appears to have denied sexual contact . . . was 'lost.'" The Defendant asserts that, while the State may allege this was simply coincidence, "[c]ircumstantially, the loss of this file appears to be indicative of more bad faith than coincidence. At a minimum, loss of this file was gross negligence." We disagree with the Defendant's allegations that the loss of A.G.'s file was a result of bad faith or gross negligence. According to Wallace's affidavit, A.G.'s file was lost because of a bureaucratic shuffling and moving of files within DCS. Apparently, DCS workers, including Wallace, conducted an extensive search for the missing file but failed to find it. Unquestionably, the Defendant has failed to prove that the State acted in bad faith by losing the evidence. The only conclusion remaining is that the evidence was negligently lost, and we conclude that the conduct was simple negligence, as opposed to gross negligence.

The second factor we must consider addresses the significance of the missing evidence, "in light of the probative value and reliability of secondary or substitute evidence that remains available." Id. In his appellate brief, the Defendant contends that his trial was a credibility contest between A.G., who testified that the Defendant raped and sexually molested him, and the Defendant, who denied that he touched A.G. The Defendant asserts that, as a credibility contest, "[t]he significance of any prior statements by the alleged victim that no sexual contact occurred is extremely important." The Defendant further contends that the Our Kids Center examination report of A.G. was a "weak substitute for the denials and coercive questioning [the Defendant] believe[s] would have been in the DCS file."

We respectfully disagree with the Defendant's assumptions that the lost statement contained denials of sexual contact and evidence of coercive questioning by DCS. The only evidence presented about the contents of the missing file was the Our Kids Center examination report, which stated that A.G. "has not disclosed much detail about the sexual contact" during a DCS interview. If A.G.

-29-

stated that the Defendant abused him but did not disclose much detail about the sexual contact in the missing statement, then the Defendant would have had difficulty using the statement to impeach A.G. As to the availability of secondary or substitute evidence, the Our Kids Center examination report of A.G. stated: "When questioned about sexual contact, [A.G.] denied anyone had touched his private areas." During cross-examination, A.G. stated that he did not remember going to a hospital in Nashville after he told his mother about the abuse and did not remember "anybody ever looking at [him] and asking [him] questions about [the abuse]." Thus, it appears that the Defendant attempted to impeach A.G. using this prior inconsistent statement in the Our Kids Center examination report, but he was unsuccessful because A.G. could not recall going to the Our Kids Center in Nashville. In addition to the questionable impeachment value of A.G.'s missing prior recorded statement, there was certainly no guarantee that A.G. would have remembered the initial interview with DCS in light of the fact that he could not remember the examination at the Our Kids Center. Aside from the possible impeachment of A.G., the missing file did not prevent the Defendant from presenting a comprehensive defense to the charges alleged in this case. The Defendant vigorously cross-examined all the State's witnesses, especially Agents Ellis and Forrestall, and he presented expert testimony to explain that A.G. may have lied about being sexually abused and that the Defendant may have been coerced into confessing by the agents' interrogation techniques. Therefore, in spite of the unavailability of A.G.'s prior recorded statement, we conclude that the Defendant presented his defense in as complete a manner as was possible without the missing evidence.

The third factor to consider is the sufficiency of the other evidence used at trial to support the conviction. Id. As explained above, the evidence was sufficient to support the Defendant's convictions of aggravated sexual battery. A.G. testified that the Defendant touched his penis under his pajamas twice. A.G. also testified that the Defendant performed oral sex on him in his sister's room and that A.G. performed oral sex on the Defendant in his sister's room. The Defendant admitted to Agent Ellis that he performed oral sex on A.G. twice and that A.G. performed oral sex on him once. In the Defendant's written confession, he admitted to having sexual contact with A.G. two to three times. Thus, the evidence presented was sufficient, as a matter of law, for conviction.

As a remedy for the missing prior recorded statement of the victim, the trial court gave an instruction to the jury about the missing file. The trial court's instruction was almost identical to the instruction suggested in Ferguson. Id. at 917, n.11. We conclude that, under the facts and circumstances of this case, the trial court's jury instruction protected the Defendant's right to a fair trial. Therefore, we conclude that the Defendant was not hindered in the full and complete exposition of his theory of defense to the jury. We conclude that the Defendant received a fundamentally fair trial and that he experienced no measurable disadvantage because of the missing prior recorded statement of the victim. The Defendant is not entitled to relief on this issue.

### 2. Tennessee Rule of Criminal Procedure 26.2

In a related issue, the Defendant contends that the State violated Tennessee Rule Criminal Procedure 26.2 when it failed to produce A.G.'s prior recorded statement to DCS and that the trial

court "should have declared a mistrial or stricken [A.G.'s] testimony from the record. . . ." The State asserts that a mistrial was not warranted under Rule 26.2 because there was no evidence that the State "elected" not to comply. We agree with the State.

Tennessee Rule of Criminal Procedure 26.2 states in pertinent part as follows:

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified. . . .

(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice. . . .

The language of Rule 26.2(e) provides sanctions when the other party *elects not to comply* with an order to deliver a statement to the moving party. See State v. Gregory Scott Payne, No. M2000-02900-CCA-R3-CD, 2002 WL 799704, at *11 (Tenn. Crim. App., at Nashville, April 30, 2002) *perm. app. denied* (Tenn. Oct. 21, 2002).

In this case, Wallace's affidavit stated that A.G.'s file containing his prior recorded statement to DCS had been lost due to the bureaucratic shuffling and moving of files and that an extensive search for the file failed. Therefore, there was no evidence that the State "elected" not to comply with Tennessee Rule of Criminal Procedure 26.2 or that the State intentionally misplaced the file. The State could not comply with Rule 26.2 because the file was lost. Accordingly, we conclude that a mistrial was not warranted under Rule 26.2. This issue is without merit.

### F. Agent Ellis' Destroyed Notes

The Defendant next contends that the State failed to disclose that Agent Ellis had prepared notes about the Defendant's statements made during the interviews in Florida, which were the basis for his investigative report. The Defendant asserts that the State's failure to preserve these notes and provide them to the defense was a discovery violation because "these notes were direct evidence of Defendant's prior statements and investigative notes from law enforcement officers." The Defendant further claims that, had he known of the prior existence of these notes, he would have brought a motion under Ferguson. The State contends that this issue was waived because the Defendant failed to object to the unavailability of the notes and to file a motion under Ferguson to exclude Agent Ellis' testimony. The State further argues that, even if this issue were not waived, the destroyed notes would not have been exculpatory; therefore, under Ferguson, the State had no duty to preserve

the notes.

The Defendant filed a motion to suppress his handwritten and oral statements about sexually abusing A.G. that he made to Agents Ellis and Forrestall during the Florida interviews. The Defendant argued in the motion that his statements should be suppressed because they were involuntary, relying upon State v. Phillips, 30 S.W.3d 372 (Tenn. Crim. App. 2000). The trial court denied the motion to suppress, ruling that "after considering the totality of the circumstances, [the Defendant's statement was given] voluntarily and he knew what he was doing and it was a free act on his part. He freely admitted that he was Mirandized initially. He was re-Mirandized, [and] he signed the forms." At trial, Agent Ellis testified that he based his testimony upon the investigative reports he reviewed prior to testifying, and he made the investigative reports from his handwritten notes, which "were shredded after we thought the case had been resolved."

While the Defendant raised this issue in his motion for a new trial, he never objected at trial or at the suppression hearing to Agent Ellis' testimony based upon a discovery violation or on Ferguson grounds. After thoroughly reviewing the record, we conclude that the Defendant had ample opportunity to discover, before the trial began, the fact that Agent Ellis had shredded the notes that were the basis of his investigative reports. The Defendant should have noticed prior to trial that Agent Ellis' notes from the interviews in Florida were not provided by the State during discovery, and, accordingly, he should have filed a motion to compel discovery of those documents. After discovering that the notes had been destroyed, the Defendant then should have filed a motion to suppress Agent Ellis' testimony based upon Ferguson, as he did for the lost DCS file. Finally, the Defendant could have objected to Agent Ellis' testimony based upon a discovery violation or Ferguson immediately after Agent Ellis testified that he made the investigative reports from his handwritten notes, which "were shredded after we thought the case had been resolved." Therefore, we conclude that this issue is waived because the Defendant failed to object to Agent Ellis' testimony on this basis before or during his trial. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Thus, we conclude that this issue is without merit.

### G.  Bill of Particulars

The Defendant contends that the State failed to provide a sufficient bill of particulars because it failed to adequately narrow down the time-frame for the offenses, who was present during the incidents, and where the incidents took place. The Defendant also claims that the bill of particulars failed to list a witness who was present during one of the offenses. He contends that, as a result of the insufficient bill of particulars, he was prejudiced because he was unable to prepare a defense and avoid prejudicial surprise at trial. Therefore, the Defendant argues that his convictions should be reversed. The State contends that this issue is without merit because the indictment and the bill of particulars limited the time of the offenses to a two-year period and any variance with respect to an additional witness present during the offenses was not material. We agree with the State.

The State filed a bill of particulars which stated, in pertinent part, as follows:

[Count One]:
Time:  bedtime
Place:  house on May Apple Drive in victim's bedroom
Persons present: defendant and victim, defendant was babysitting while parents were
at Miss Sherry's
Sexual acts:  defendant put hands down victim's pants, touched victim's penis

[Count Two]:
Time:  bedtime
Place:  victim's bedroom or victim's sister's bedroom on floor
Persons present:  defendant and victim in bedroom, parents and sister were in living
room at times, sometimes not
Sexual Acts:  defendant put his mouth on victim's penis

[Count Three]:
Time:  bedtime
Place:  victim's bedroom or victim's sister's bedroom on floor
Persons present:   defendant and victim, parents were in living room at times,
sometimes not
Sexual acts:  victim put his mouth on defendant's penis

The indictment alleged that the Defendant committed the offenses against A.G. "during the years
1997 and 1998. . . ."

Tennessee Rule of Criminal Procedure 7(c) provides that "[u]pon motion of the defendant
the court may direct the filing of a bill of particulars so as to adequately identify the offense
charged." Information that may be required in the bill of particulars includes, but is not limited to,
"details as to the nature, time, date, or location of the offense." State v. Speck, 944 S.W.2d 598, 600
(Tenn. 1997) (citing State v. Byrd, 820 S.W.2d 739, 741-42 (Tenn. 1991)). The purposes of a bill
of particulars are threefold: (1) the bill serves to provide the defendant with sufficient information
about the offenses alleged in the indictment to permit the defendant to prepare a defense; (2) the bill
serves to permit the defendant to avoid prejudicial surprise at trial; and (3) the bill enables the
defendant to preserve a plea of double jeopardy. Byrd, 820 S.W.2d at 741 (citing State v. Hicks, 666
S.W.2d 54, 56 (Tenn. 1984)); State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); State
v. Gibson, 973 S.W.2d 231, 241 (Tenn. Crim. App. 1997).

The well-established law in Tennessee does not require an exact date or year of an offense
to be stated in an indictment "unless the date or time 'is a material ingredient in the offense.'" Byrd,
820 S.W.2d at 740 (quoting Tenn. Code Ann. § 40-13-207). In order to establish the legal
sufficiency of the indictment, "the state need allege only that the offense was committed prior to the
finding of the indictment or presentment." Id. (citing Tenn. Code Ann. § 40-13-207). In Byrd, the

Tennessee Supreme Court acknowledged "that in many cases of child sexual abuse, the state will be unable to offer specific dates on which the alleged offenses occurred. . . . [S]uch inability should not necessarily serve as a basis for automatic, outright dismissal of an otherwise legally sufficient indictment or presentment." Byrd, 820 S.W.2d at 741. Instead, "a court faced with this dilemma should make every effort to see that the prosecution supplies critical information in the bill of particulars." Id.; see Gibson, 973 S.W.2d at 241.

If exact dates cannot be provided, the State can provide descriptive information in the bill of particulars "that will tend to narrow the time-frame of the indictment. . . ." Byrd, 820 S.W.2d at 742; see Gibson, 973 S.W.2d at 241. The Byrd Court explained:

> [I]n a child sexual abuse case involving a victim too young to give exact dates, the child may be able to define the time of the offense by reference to such memorable occasions in a child's life as birthdays, seasonal celebrations and holidays, the beginning or end of the school year, or visitations by relatives.

Byrd, 820 S.W.2d at 742. Even if the State is unable to give even an approximate time of the alleged offense by means of a descriptive reference, "a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity." Id. However, "a conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant." Id. The Byrd Court explained:

> [I]t is only by *post hoc* examination of the matter that the court will be able to determine whether deficiencies in the bill of particulars prevented the defendant from preparing an adequate defense, caused undue and prejudicial surprise, or made untenable a later plea of double jeopardy. In other words, the trial court cannot determine whether or not the defendant has been hampered in his defense until the court knows what proof the state will offer as to the time and place of the offense, and how this evidence relates to the actual theory of defense. Generally, none of this will be apparent until the case has been tried.

Id. at 741.

This Court explained, "A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." Shropshire, 45 S.W.3d at 71 (citing State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984); State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)). The variance is not to be regarded as material when the indictment or the bill of particulars and the proof substantially correspond. Id. (citing State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993)). "A material variance occurs only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging instrument." Id. (citing Mayes, 854 S.W.2d at 640).

In this case, the Defendant contends that the time-frame alleged in the indictment for the sexual abuse offenses was too open "to allow the [D]efendant to adequately prepare a defense. Additionally, the bill of particulars for Counts [2 and 3] did not adequately narrow down persons present or place. Finally, . . . the bill did not list a person [A.G.] testified was in the room when one sexual contact occurred: [A.G.'s] brother." The Defendant asserts that, had he known that A.G. was going to testify that his brother was in the room when the Defendant sexually molested A.G., the Defendant would have called A.G.'s brother to testify at trial "to substantiate [D]efendant's claim that nothing sexual occurred between the [D]efendant and the alleged victim, especially in the presence of [A.G.'s brother]." Thus, the Defendant argues that the variance between the bill of particulars and the proof at trial was material and harmed the preparation of his defense, thereby requiring his conviction in Count 1 to be reversed. We respectfully disagree with the Defendant's assertions.

As to the Defendant's claim that he was unable to adequately prepare a defense due to the lack of specificity about when the offenses occurred, we conclude that this issue is without merit. The evidence shows that A.G. could not give specific dates of the sexual abuse or even the months when the sexual abuse occurred in 1997 and 1998. However, A.G. testified that he believed he was in either the second or third grade when the Defendant sexually molested him. A.G. stated that a summer passed between the first and second incidents of abuse, and that the second incident also happened during the school year. A.G. testified that the third incident involving oral sex with the Defendant in his sister's room occurred during the same school year. Furthermore, Agent Ellis testified that the Defendant admitted to him that he had sexual contact with A.G. in 1997 and 1998. Although the bill of particulars in this case did not narrow the time-frame of the offenses, the bill gave specific information about the time of day of the offenses, the place of the offenses, the people present during the offenses, and the type of sexual contact that occurred during the offenses. The record shows that the State did not have any additional information in its possession that would have narrowed the time-frame of the offenses. Further, the Defendant does not allege in his appellate brief that he was surprised by A.G.'s testimony concerning the time-frame of the offenses. After thoroughly reviewing the record, we conclude that the Defendant's defense was not hampered by the lack of specificity as to the time-frame of the offenses in the bill of particulars. See Byrd, 820 S.W.2d at 742. This issue is without merit.

As to the Defendant's claim regarding the variance between the bill of particulars and the proof at trial, we conclude that this issue is also without merit. The evidence shows that A.G. testified that, while his parents were across the street at "Ms. Sherry's house" and his brother was on the floor of the bedroom playing video games, the Defendant, who was on the bed with A.G., reached under A.G.'s pajamas and touched his penis. The bill of particulars did not list A.G.'s brother as a "person present" during the offense of aggravated sexual battery. However, A.G. testified that, when the sexual touching occurred, his older brother was paying attention to his video game. Therefore, even if A.G.'s brother would have testified that he never saw the Defendant sexually abuse A.G., this testimony would not substantiate the Defendant's claim that no sexual abuse occurred. Furthermore, after A.G. testified that his brother was in the room during one incident of sexual abuse, the Defendant could have requested that A.G.'s brother be added as a witness for the defense. After thoroughly reviewing the record, we conclude that the bill of particulars and the proof presented at

trial substantially corresponded; therefore, the variance between the bill of particulars and the proof was not material. See Shropshire, 45 S.W.3d at 71. Furthermore, the State did not attempt to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the indictment or the bill of particulars. Id. Thus, this issue is without merit.

### H. Motion to Suppress the Defendant's Written and Oral Admissions

The Defendant next contends that the trial court erred in denying his motion to suppress the Defendant's handwritten and oral statements given to Agents Ellis and Forrestall in Florida. The Defendant asserts that, under State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000), the Defendant's admissions to the agents "were not made of a free and voluntary will, but were coerced and involuntary." He contends that the admission of the statements was highly prejudicial because they impeached his testimony and provided the only corroboration of A.G.'s testimony of sexual abuse. The State contends that the Defendant's statements were voluntary and that he was Mirandized twice before making any statements. The State asserts that the agents did not engage in any coercive behavior that caused the Defendant to make an involuntary statement. Thus, the State argues that, considering the totality of the circumstances, the trial court properly denied the motion to suppress.

After hearing testimony from Agent Ellis, Agent Forrestall, and the Defendant at the suppression hearing, the court made the following findings:

It is true that in Tennessee we have a constitution that is more restrictive than the Federal Constitution when it comes to the protection of individual rights of a citizen, and the test of whether or not a statement is made voluntarily under the Tennessee Constitution is broader and more protective than the test of voluntariness under the United States Constitution.

Tennessee Law requires a Court to consider the totality of the circumstances when making a decision about the admissibility of a statement when its admissibility has been challenged and the issue is whether or not it has voluntarily been made[.] . . . [T]he reason that you have to consider it on a case-by-case basis and the totality of the circumstances, is because no two circumstances are always the same. Defendants are not the same. Officers that conduct the questioning are not the same, so you have to look at everything on a case-by-case basis. In this case, the Defendant maintains that the statements that he gave were not voluntarily made. And he contends that they were not voluntarily made because he was coerced. Now, the testimony has established that the Defendant was arrested on July 17, 1998 in a public place while the Defendant was in his words, walking around smoking a cigarette. The Defendant was approach[ed] and immediately arrested and advised that he was being placed under arrest because of a charge of engaging in interstate travel with the intent to engage in a sex act with a minor. He was placed in a vehicle, he was transported to [the Florida Department of Law Enforcement]. . . . There was no conversation

-36-

conducted in the vehicle when he was transported to that facility and when he got there, he was presented forthwith with a Miranda Warning form or Rights Advisement Form, which the Defendant said he read and that he signed.

There was a period of time when he was asked questions by two officers, Forrestall and Ellis and for some period of hours, [the Defendant] maintained his innocence. The Defendant does not raise any issue in his papers nor does the testimony suggest that the coercion that he is alluding to is physical coercion. He hasn't maintained that he was beaten or struck or physically forced to sign or say anything. His contention is that the things that were said and the representations that were made were false or were a lie and it basically tricked him into going along with something that otherwise, he would not have gone along with. What [the Defendant] says is that after some period of time, that went over two to three days, he finally said okay, I have engaged in this criminal conduct up in Tennessee and according to [the Defendant], . . . what he said was the benefit that I thought I was getting was preventing them, meaning the alleged victims in this indictment, from having to go through what I was going through. So, [the Defendant's] testimony indicates that the reason that he relented and went along with this suggestion that he was a criminal, and engaging in these acts was because he thought he was doing a favor to these children, and that's the benefit that he saw that he was going to derive from all this.

According to the testimony that has been offered here, [the Defendant] is intelligent. He is certainly articulate. According to the testimony, he answered the questions that were posed to him by the officers. He based his testimony here today, had a good memory. He recalled details. He recalled things that were said to him, and the written statement in question is a statement that he wrote outside the presence of the officers . . . . [I]t was done while he was alone and there is an indication . . . that when you read it, it has a sort of a reflective tone about it. . . . [I]n terms of his ability to understand what was going on around him, all the evidence indicates that he knew where he was, he knew what was being asked of him, he responded appropriately, he sat down outside the presence of these officers and wrote out this statement.

Now, the Phillips case says a lot, but the Phillips case in pertinent part at one point says that the crucial question is whether the behavior of the State's officials was such as to overbear the Petitioner's will to resist and bring about confessions, not freely self-determined. In other words, did these officers overbear [the Defendant's] will and cause his will just to break down to the point he couldn't resist anymore and he confessed to crimes that he didn't commit and that he certainly would not have voluntarily and freely and through self-determination made the confession but for the overbearing conduct on the part of the officers? And the evidence today that I have heard doesn't bear that out. . . . [W]hether he thought he was going to get a benefit that turned out not to be true, may be something for the Court to consider, but whether it is admitted or not, doesn't hinge on that.

-37-

The Court finds that after considering the totality of the circumstances, he did what he did voluntarily and he knew what he was doing and it was a free act on his part. He freely admitted that he was Mirandized initially. He was re-Mirandized, he signed the forms. He even signed a consent to search form. So the motion to suppress is denied.

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23; see State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 22-23; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In this case, the Defendant does not dispute that he made a voluntary, knowing, and intelligent wavier of his rights to counsel and against self-incrimination during the interviews with Agents Ellis and Forrestall. Instead, the Defendant argues that the statements he made during his custodial interrogations were involuntary because they were the product of coercion.

"Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." Phillips, 30 S.W.3d at 376 (citing Rogers v. Richmond, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. Id. at 377 (citing Monts v. State, 218 Tenn. 31, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." Id. (citing State v. Brimmer, 876 S.W.2d 75, 79 (Tenn.1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" Id. (quoting Rogers, 365 U.S. at 544); see State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. Phillips, 30 S.W.3d at 377 (citing Rogers, 365 U.S. at 544).

In State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996), the Tennessee Supreme Court concluded that a social worker's statement to the defendant that the district attorney might not prosecute him for sexual abuse if the defendant told the truth and received counseling could not reasonably be interpreted as a promise that there would be no prosecution. The Court further concluded that a statement that the defendant would be prosecuted if he chose not to admit unlawful conduct was insufficient to render his subsequent confession involuntary. Smith, 933 S.W.2d at 456. Under all the circumstances, the Smith Court concluded that the defendant's statements were not "compelled" in violation of the state or federal constitution. Id. However, the Court noted that the interrogator's remarks were "on the line, but did not cross it." Id. at 458. The Court then expressed "the strongest disapproval of any practice whereby state agents encourage suspects to seek counseling for the purpose of eliciting incriminating statements for use in a subsequent prosecution." Id.

In Phillips, the defendant drove himself to the Tennessee Department of Human Services for an interview regarding the alleged sexual abuse of the defendant's stepdaughters. Phillips, 30 S.W.3d at 374. The investigators interrogated the defendant for about one hour, and, although he repeatedly and steadfastly denied any sexual misconduct for much of the interview, the defendant finally admitted to sexually abusing one of his stepdaughters. Id. This Court reviewed a thirty-six page transcript of the interrogation of the defendant which revealed: (1) misrepresentations by an investigator; (2) numerous steadfast denials by the defendant; (3) statements that law enforcement officials would be involved if the defendant did not confess to sexually abusing his stepdaughter; and (4) promises of treatment for the defendant and his stepdaughter only if he fully confessed to the crimes. Id. at 377. The promises and inducements were made repeatedly by the investigators prior to the defendant's confessions. Id. This Court concluded that "[t]he actions of the interrogators were much more coercive than those found in Smith and, unlike Smith, crossed the line." Id.

In this case, unlike Phillips, no recordings or transcripts of the interviews with Defendant were made by the agents. Therefore, we must review the Defendant's testimony and the testimony of Agent Ellis and Agent Forrestall to determine whether the Defendant's statements were voluntary. After thoroughly reviewing the testimony at the suppression hearing, we conclude that the evidence does not preponderate against the trial court's findings that the Defendant voluntarily made his statements to the agents.

Agent Ellis testified that, after being arrested, the Defendant signed the Miranda rights form and said that he did not want an attorney. Agent Ellis stated that they used a "good cop/bad cop" routine on the Defendant to extract information. Agent Ellis testified, "I remember specifically relating that if he wanted to cooperate, that it had to be one hundred percent and that if he did cooperate, that I would represent that cooperation to whatever authority was appropriate." The initial interview at the Florida Department of Law Enforcement headquarters lasted approximately three and a half hours, and then the agents transported the Defendant to the Leon County Jail. Agent Ellis testified that there was no "talk about children being removed from the home and children being removed [from] their parents. . . ." Agent Forrestall likewise denied telling the Defendant that the victims would be removed from their homes. Agent Forrestall testified that he told the Defendant that his pedophilia was a sickness that needed to be treated and that the victims he abused also needed help. On the way to the jail, Agent Forrestall stated that the Defendant said that he wanted to get help, but that he did not want to talk that evening.

At the Leon County Jail the next morning, the agents advised the Defendant of his Miranda rights again, and the Defendant again signed the rights form. Agent Ellis explained that the Defendant "had a frame of mind to disclose" and that "he was almost repent[a]nt." Agent Forrestall denied slamming his fists on the table during the interviews or throwing his legal pad down on the table. The agents explained that the Defendant related that he had been sexually abused as a child. Agent Forrestall stated that he told the Defendant "that he needed to be truthful and admit to his past and to himself, and that was the only way we were going to be able to get him any kind of counseling. . . . [W]e were trying to explain to him that this is an illness and a disease . . . ." The agents stated that the Defendant agreed to compose letters to the victims and their families regarding the sexual abuse and to write down "any additional thoughts." Agent Ellis stated that he returned the following morning and reminded the Defendant that he had been Mirandized on two previous occasions. The agent said the Defendant gave him the pad that contained the written confessions of sexual abuse, and they discussed those written confessions. Agent Ellis denied offering the Defendant any kind of leniency, rather he told the Defendant that, if he cooperated, the agents would "represent that cooperation to the appropriate entities . . . ." Agent Ellis testified that neither he nor Agent Forrestall promised the Defendant treatment if he admitted to abusing children.

The Defendant testified that, at the time he was arrested and taken to the Florida Department of Law Enforcement, he had been up for thirty-one hours straight and was very tired. He admitted to signing the Miranda rights form. The Defendant stated that the agents "mentioned that there must be an admission for me to receive help and for [the victims] to receive help." He stated that Agent Forrestall said "you know by lying and saying that you weren't f****** these kids, keeping us from getting them the help they need, we can charge you with obstruction of justice? And he threw his note pad." The Defendant said that Agent Forrestall also slammed his fist on the table in front of him as he yelled at him. The Defendant stated that Agent Forrestall said "because of my continual denials, they were going to take [the victims] into custody for ninety days, in a juvenile detention center. He said that they would be isolated from each other and their parents and interrogated . . . until they admit to being raped." The Defendant stated that he did not sleep at all in the jail because the guards kept waking him up every fifteen minutes. He stated that he started to cooperate the next day because he

did not want the victims to go through the interrogations and questioning by police. He said that he admitted to sexually touching the children. He stated that he believed that he was saving the children from going through intrusive interrogations about the abuse. The Defendant said that the agents did not offer him any leniency "[o]ther than the fact that they offered help and offered to represent my cooperation . . . . The benefit that I thought I was going to get out of it was preventing [the victims] here in Tennessee from [being interrogated about the abuse]."

After thoroughly reviewing the evidence, we conclude that Phillips is distinguishable from the case under submission. In Phillips, the investigators made misrepresentations to the defendant and promises of treatment for the defendant and his stepdaughter only if he fully confessed. In this case, the trial court credited the testimony of Agent Ellis and Agent Forrestall instead of the Defendant's testimony. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. Odom, 928 S.W.2d at 23. The agents denied promising the Defendant leniency in return for cooperation, and the Defendant admitted that they did not promise leniency. Agent Forrestall testified that he told the Defendant he was sick and needed treatment, but Agent Ellis stated that they did not tell the Defendant that he would get treatment only if he admitted to sexually abusing the children. The agents denied telling the Defendant that they would take the abused children away from their parents if he did not admit to sexually abusing them. Accordingly, after thoroughly reviewing the evidence from the suppression hearing, we conclude that the evidence does not preponderate against the trial court's findings that the Defendant voluntarily made the statements to the agents. Therefore, we agree with the trial court's conclusion that, considering the totality of the circumstances, the Defendant freely and voluntarily confessed to sexually abusing A.G. This issue is without merit.

## I. Lesser-Included Offenses

Next, the Defendant contends that the trial court erred in failing to instruct the jury on the offense of child abuse as a lesser-included offense of child rape. The State contends that a jury instruction on child abuse was not required in this case because there was no evidence that the Defendant physically injured the victim or that the victim had an impairment of a mental faculty. We agree with the State.

The trial court has a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction is supported by the evidence, regardless of whether the Defendant has requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser-included offenses is de novo with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002).

If an offense is found to be a lesser-included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser-included offense. Bowles, 52 S.W.3d at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. The court must view the evidence

liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469.

The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." Id. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

In State v. Elkins, 83 S.W.3d 706, 711 (Tenn. 2002), the Tennessee Supreme Court applied the Burns test and held that child abuse is a lesser-included offense of rape of a child and must be so instructed if the evidence presented at the trial is legally sufficient to support a conviction of child abuse. In Elkins, the victim testified that the defendant held her down, that she attempted to fight him off, and that she sustained bruises on her body as a result of the defendant's conduct. Elkins, 83 S.W.3d at 711. Other witnesses testified to seeing the bruises on the victim. Id. Therefore, the court determined that, "viewing the evidence presented at trial liberally in the light most favorable to the existence of the lesser-included offense, . . . we conclude that an instruction on child abuse was warranted in this case because the evidence, viewed in this light, is legally sufficient to support a conviction of child abuse." Id.

A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Tenn. Code Ann. § 39-15-401(a) (1997). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (1997).

In this case, the trial court instructed the jury in Counts 2 and 3 on rape of a child and the lesser-included offenses of aggravated sexual battery, sexual battery, and assault, but did not instruct the jury on child abuse. This failure to instruct on child abuse would be error if the evidence presented at trial was legally sufficient to support a conviction of child abuse. After thoroughly reviewing the evidence presented, we conclude that the evidence was not legally sufficient to support a child abuse conviction. In this case, A.G. did not testify to any bodily injury such as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." See Tenn. Code Ann. § 39-11-106(a)(2). A.G.'s examination report from the Our Kids Center stated that A.G. did not have any bodily injuries to his genital or anal regions and stated that A.G. "reported no problems or concerns." In his appellate brief, the Defendant contends that "the jury could have determined that child abuse was appropriate as physical injury was possible with fellatio of a young child, such as if a child resisted fellatio, injury is possible in that sensitive area; and that A.G.'s mental health may have been injured." However,

the Defendant's assertions are based upon pure speculation that A.G. may have been injured. There was no proof presented at trial that the Defendant actually injured A.G. Therefore, viewing the evidence presented at trial liberally in a light most favorable to the existence of the lesser-included offense, without judging its credibility, we conclude that an instruction on child abuse was not warranted in this case because the evidence, viewed in this light, is not legally sufficient to support a conviction of child abuse. See Ely, 48 S.W.3d at 722; Burns, 6 S.W.3d at 469. Accordingly, we conclude that the trial court did not err by not instructing the jury on child abuse. This issue is without merit.

## J. Improper Closing Arguments

The Defendant next contends that the State's opening and closing arguments "were so improper that they infected the trial with unfairness and denied due process to the Defendant." The State contends that the Defendant waived this issue because he never objected to any of the statements during the State's opening and closing arguments. We agree with the State.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)); State v. Goltz,111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Terry, 46 S.W.3d at 156 (citing Sutton, 562 S.W.2d at 823); see Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975); Goltz, 111 S.W.3d at 5. This Court has explained that "[closing] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Goltz, 111 S.W.3d at 5 (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

When an appellate court finds an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." Goltz, 111 S.W.3d at 5 (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In Goltz, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2.  It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.  See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN. CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).
3.  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.  See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).
4.  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.  See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).
5.  It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

We agree with the State that the Defendant has waived this issue by his failure to raise a contemporaneous objection at trial, either during opening argument or closing argument.  Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint).  However, even if not waived, we conclude that this issue is without merit.  The Defendant objects to the State's reference to Arthur Lee Stevens in the opening argument; however, at that point in the trial, the State believed that it would call Stevens because the trial court had not ruled whether that witness could testify.  Therefore, we conclude that the prosecutor's statement during opening argument was not improper.  The Defendant objects to the following statements made by the prosecutor in his closing argument:

. . . . But if it is a credibility contest, we ask you to consider carefully, the testimony of [A.G.].  [A.G.] is eleven now.  [A.G.] told you a couple of days ago about some things that occurred when he was seven and eight years old.  That's something like three or four years into [A.G.'s] life, in the past. . . .

Considering the exact circumstances of this case, [A.G.'s] credibility, the State would submit to you is quite good. [The Defendant's] credibility, a long, long time ago a very distinguished person once said something like you can fool all of the people some of the time; you can fool some of the people all of the time, but you can't fool all of the people all of the time.  Why is that important?  It is important because there is four years of history here. . . .

In that four year history, it seems that there were three interviews with the police. It seems that there was a prior hearing. And of course, we are having this jury trial. And yesterday, by the State's recollection, which doesn't count. Yours does. The State recollects [the Defendant] denying any kind of touching of [A.G.'s] penis or any kind of mouth of anybody's penis act, and in the State's recollection . . . is that he had a pretty clear memory of the three interviews. The four year history, you can't fool all of the people all of the time! I think I remember asking him do you admit or deny that you lied to the police? My recollection of that answer is that he admitted that he lied to the police? . . . .

If this is a swearing contest, the question may be this? May be this simple, does the testimony of [the Defendant] raise a reasonable doubt as to the testimony of [A.G.]? And the State submits that it does not. You don't need to go beyond that.

But the State's contention as we told you earlier today is it is not really a swearing contest. . . .

Ladies and gentlemen of the jury, what this proof shows, the State would submit is [A.G.'s] love, his trust was perverted by [the Defendant] in order to gratify one of the blackest of human desires and the proof supports that beyond a reasonable doubt and to a moral certainty. . . .

Who['s] on trial? Well, the Defense wants to try Forrestall. Okay, it's twelve years old, he messed up. Hopefully, he'll do better. . . . Forrestall hasn't lied to you about it. DCS is on trial. They lost their file. I wish they hadn't done that. And you are going to be instructed, if you want to, you can infer that that missing evidence that they lost, should be held against the State and I apologize and I don't know what to say other than that, we wish it was here.

Who is on trial here? Ellis? Where is his notes? Well, remember what Ellis said? For some reason, he thought the case was disposed of and he shredded his notes, so Ellis is on trial. So, [the Defendant] isn't guilty? Well, no. No.

Maybe [A.G.'s mother] is on trial? Maybe the D.A.'s office is on trial? They influenced [A.G.]? They interviewed him three times. She hasn't talked to him. Remember [A.G.'s] testimony? What did your Mom tell you? She told me to tell the truth. . . .

[A.G.] is on trial too. He is on trial because he had suicidal tendencies. Okay, he did. Why did he have suicidal tendencies, because the man in his life, this gentleman here, was sent to perform his military duty eight thousand miles away for a year. What is the significance of that? The significance of that is this. [The Defendant] rather candidly admitted that he knew of these suicidal tendencies and if you conclude [the

-45-

Defendant] was trying to weasel his way into [A.G.'s] confidence, that, the State would submit, is something that could be used to do that. . . .

Ladies and gentlemen of this jury, this is a Nintendo 64 case. This is the Dad was in Korea for a year case and [A.G.] really missed him case. The Defense tells you that this is the case of the soft voice of influence, and the State asks you, ladies and gentlemen of the jury, to consider the possibility that this is the case of the loud voice of perjury.

The Defendant claims that the State's closing argument was improper and that, as a result of this argument, the Defendant was denied due process. We respectfully disagree. The prosecutor's statements during closing argument conformed to the evidence presented at the Defendant's trial. Many of the prosecutor's statements were made in response to the Defendant's closing argument which challenged the credibility of A.G., Agent Ellis, and Agent Forrestall and implied that A.G. was improperly influenced by the district attorney's office and by DCS. Accordingly, we conclude that the prosecutor's statements during closing argument were not improper. This issue is without merit.

## K. Supplemental Jury Instructions

The Defendant next contends that the trial court erred by giving the jury a supplemental instruction entitled, "Revised Instruction on Order of Consideration." He asserts that the trial court should have admonished the jury not to place undue emphasis on the supplemental order of consideration instructions and to consider them in conjunction with the entire charge. The Defendant contends that, as a result of this supplemental instruction, the jury returned in less than one hour with the three guilty verdicts. The State contends that the Defendant has waived this issue because he failed to object to the supplemental jury instruction at trial. The State also asserts that the revised instruction merely clarified the order in which the jury was to consider the charged offenses and their respective lesser-included offenses, and that the main charge contained an instruction no to single out one instruction over any other. We agree with the State.

"As a general rule, it is within the province of the court to recall a jury for supplemental instructions, but it is considered the better practice to admonish the jury not to place undue emphasis on the supplemental instructions and to consider them in conjunction with the entire charge." Leach v. State, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977). "In some cases, failure to so admonish the jury can amount to reversible error. Whether it is reversible error is determined by examining the entire record to ascertain if such action might reasonably be expected to prejudice a defendant." Id. (citing Burton v. State, 217 Tenn. 62, 394 S.W.2d 873 (1965)).

In this case, the original instruction on the order of consideration, as to Count 1, provided as follows:

If you have a reasonable doubt as to the defendant's guilt of Aggravated Sexual Battery as charged in count one of the indictment, then your verdict must be

not guilty as to this offense, and then you shall proceed to determine his guilt of the lesser included offense of Sexual Battery. If you have a reasonable doubt as to the defendant's guilt of Sexual Battery, then your verdict must be not guilty as [sic] this offense, and then you shall proceed to determine his guilt of the lesser included offense of Assault. If you have a reasonable doubt as to the defendant's guilt of Assault, then your verdict must be not guilty as to count one.

The trial court gave similar instructions for Counts 2 and 3, except those instructions started with the charged offenses of rape of a child.

After the trial court instructed the jury and the jury retired for deliberations, the trial court announced that, before the jury took a break for supper, it would give jurors a revised instruction on the order of consideration portion of the original jury instructions. The Defendant did not object to the trial court giving the supplemental instruction. The trial court told the jury the following:

Ladies and Gentlemen, I am sorry to disturb you, but I know that we have sent out for some supper for you and it is on its way and it will be here soon and you are going to be breaking for that, so I thought I would call you up here. I was looking through my instructions and it occurred to me that maybe I didn't do a very good job of writing on of the instructions, that perhaps I could have written it a little more clearly. And so, I have rewritten it and I want to give it to you now, but I want you to understand that it does not mean that what I wrote originally was wrong. It is not wrong, it's just that I don't think that I wrote it as clearly as I should have for folks who don't deal with it everyday, and so I want to give you this just to add to your collection and then we will leave you alone and let you get back to your business. . . .

The trial court gave the following revised instruction on the order of consideration as to Count 1:

Commence your deliberations by first considering count one of the indictment. The defendant is charged in count one with Aggravated Sexual Battery. First, consider whether the defendant is guilty of Aggravated Sexual Battery. If so, mark the count one verdict form accordingly and stop your deliberations as to count one. If you find the defendant not guilty of Aggravated Sexual Battery, then consider whether the defendant is guilty of the lesser included offense of Sexual Battery.

If you find the defendant guilty of Sexual Battery, mark count one verdict form accordingly and stop your deliberations as to count one. If you find the defendant not guilty of Sexual Battery, then consider whether the defendant is guilty of the lesser included offense of Assault.

If you find the defendant guilty of Assault, mark the count one verdict form accordingly and stop your deliberations as to count one. If you find the defendant not guilty of Assault, then you have found the defendant not guilty of the offenses

-47-

embraced in count one of the indictment. Mark the verdict form for count one accordingly.

The trial court gave similar revised instructions for Counts 2 and 3, except those instructions started with the charged offenses of rape of a child. After giving the revised instructions, the trial court told the jury, "Take these and consider them in conjunction with the other instructions that I have given you and recommence your deliberations. We will let you go back down to your room and your food will be here shortly . . . ."

First, we conclude that the Defendant waived this issue because he did not object to the supplemental instruction when the trial court announced its intention to give the instruction. Tenn. R. App. P. 36(a); State v. McPherson, 882 S.W.2d 365, 375 (Tenn. Crim. App. 1994). Even if this issue was not waived, we conclude that it is without merit. The supplemental instruction given by the trial court was legally correct and was a clarification of the original instruction regarding the order of consideration. Furthermore, while the Defendant claims that the trial court did not admonish the jury to not place undue emphasis on the supplemental instruction, the trial court did instruct the jury to "[t]ake these and consider them in conjunction with the other instructions that I have given you . . . ." Also, the jury instructions included an instruction not to single out one instruction over any other. Finally, the trial court did not "interrupt" the jury's deliberations because the jury was going to break for supper when the trial court gave the supplemental instructions. Therefore, we conclude that the trial court did not err by giving the supplemental instruction. This issue is without merit.

## L. Sentencing

Finally, the Defendant contends that the trial court erred in ordering that his sentences be served consecutively under Tennessee Code Annotated section 40-35-115(b)(5) (1997 & Supp. 2002). The trial court sentenced the Defendant to the presumptive minimum of eight years[8] for each conviction, to be served consecutively with each other, for an effective sentence of twenty-four years. Since we reversed the Defendant's conviction in Count 1 and vacated the eight-year sentence for that count, we will consider the issue of consecutive sentencing for the convictions in Counts 2 and 3. The State contends that the trial court did not abuse its discretion by ordering consecutive sentencing

---

[8]The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. – , 124 S. Ct. 2531, (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. Id. at *13-14. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." The Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id. at *31.

In the case presently before us, the trial court sentenced the Defendant to the presumptive minimum of eight years for each conviction. Therefore, the trial court's sentencing of the Defendant does not violate the law articulated in Blakely because the trial court sentenced the Defendant to the presumptive minimum, despite having found two enhancement factors.

because the Defendant was convicted of two or more statutory offenses involving the sexual abuse of a minor and the trial court considered the aggravating circumstances. We agree with the State.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.

The trial court may consider mitigating factors and enhancement factors when determining a defendant's sentence. Tenn. Code Ann. §§ 40-35-113, -114. A trial court may order sentences to run consecutively if a defendant is charged with more than one criminal offense and it finds, by a preponderance of the evidence, that one or more of several criteria are met as set forth in Tennessee Code Annotated section 40-35-115 (1997). State v. Kern, 909 S.W.2d 5, 8 (Tenn. Crim. App. 1993). These criteria include a finding by the trial court that the defendant is convicted of two or more statutory offenses involving sexual abuse of a minor "with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." Tenn. Code Ann. § 40-35-115(b)(5). Whether sentences are to be served consecutively or concurrently is a matter within the sound discretion of the trial court. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984).

The trial court ordered that the Defendant serve his sentences consecutively under Tennessee Code Annotated section 40-35-115(b)(5), finding the following:

> As previously noted by the Court, [the Defendant] had a relationship with the victim. The relationship was that of a neighbor, a friend, a person that the child was entrusted to from time to time for care. Usually baby-sitting care. So, there was a relationship that fostered–or facilitated I should say–the repeated sexual conduct that

[the Defendant] engaged with this child.

Furthermore, the Court can consider the time span of the Defendant's undetected sexual activity. The three convictions that . . . [the Defendant] has occurred over a span of time which was not really nailed down during the evidence. What the indictment alleg[es] is one thing, but what the evidence shows is what the Court has to go by. . . .

But the Court does find[] there was a time span. That it was not three offenses that occurred within a 24 hour period or any short period like that. Based on the testimony of the child they were different times of day, different dates, and different events that were going on.

Also, the Court is permitted to consider the nature and scope of the sexual acts. The evidence speaks for itself in that regard. The testimony by the child was such that the nature and scope of the sexual acts were clearly demonstrated or testified about, and the Court has considered each one of those sexual acts as described by the child.

And the Court is also permitted to consider the extent of any residual physical or mental damage to the victim. And there isn't any evidence of any residual physical or mental damage to the victim in terms of there being an expert to testify about that, or even the testimony of lay witnesses about any residual physical or mental damage.

So, the Court has considered each of these and weighed them individually. Considered them both as they apply to both the benefit and detriment of the Defendant.

The Court fixes the actual sentences for each of these crimes at eight years, and orders the sentences to be served consecutively for an effective 24 year sentence.

On appeal, the Defendant does not contest the trial court's imposition of any enhancement factors;[9] rather he challenges the imposition of consecutive sentencing. After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing in this case. The record shows that the Defendant was "convicted of two (2) or more statutory offenses involving the sexual abuse of a minor." Tenn. Code Ann. § 40-35-115(b)(5). The record also shows that the trial court properly considered the aggravating circumstances under the statute. The evidence shows that the Defendant gained the trust

[9]In his appellate brief, the Defendant failed to argue any sentencing issues other than whether the trial court erred in ordering consecutive sentencing. Accordingly, we conclude that the Defendant has waived any other sentencing issues. Tenn. R. App. P. 13(b); Tenn. Ct. Crim. App. R. 10(b). Further, as noted above, Blakely does not apply to this case.

of A.G. and his family and then abused that trust by sexually molesting A.G. The undetected sexual abuse occurred during 1997 and 1998 over an extended time-span, with two of the instances of sexual abuse occurring during the school year and one summer passing between the first and second incidents of sexual abuse. A.G. testified that the Defendant touched his penis on at least two occasions, performed oral sex on him once, and forced A.G. to perform oral sex on him once. No evidence was presented of any "residual, physical and mental damage to the victim." Accordingly, after thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion by imposing consecutive sentencing in this case. Therefore, because we reversed the Defendant's conviction in Count 1, the Defendant's remaining convictions in Counts 2 and 3 will be served consecutively, for an effective sentence of sixteen years.

## III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the trial court's judgments for Counts 2 and 3. We REVERSE the trial court's judgment for Count 1 and VACATE the eight year sentence imposed for that conviction.

_____
ROBERT W. WEDEMEYER, JUDGE